**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

GILBERTO BAEZ RIVERA,
  *Defendant-Appellant.*

No. 06-30474

D.C. No.
CR-05-02075-EFS

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

LEONEL MENDOZA,
  *Defendant-Appellant.*

No. 06-30483

D.C. No.
CR-05-02075-WAE

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

RIGOBERTO BAEZ RIVERA,
  *Defendant-Appellant.*

No. 06-30486

D.C. No.
CR-05-02075-EFS

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  v.

ALICE ESPINOZA,
  *Defendant-Appellant.*

No. 06-30493

D.C. No.
CR-05-02075-EFS

OPINION

6205

Appeal from the United States District Court
for the Eastern District of Washington
Edward F. Shea, District Judge, Presiding

Argued and Submitted
September 25, 2007—Seattle, Washington

Filed June 2, 2008

Before: Betty B. Fletcher, Andrew J. Kleinfeld, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge B. Fletcher

## COUNSEL

Beth M. Bollinger, Spokane, Washington, for defendant-appellant Gilberto Baez Rivera.

Nicholas W. Marchi, Carney & Marchi, Seattle, Washington, for defendant-appellant Leonel Mendoza.

Philip E. Nino, Spokane, Washington, for defendant-appellant Rigoberto Baez Rivera.

Dan B. Johnson, Spokane, Washington, for defendant-appellant Alice Espinoza.

Jane Kirk, Assistant United States Attorney, Yakima, Washington, for the plaintiff-appellee.

---

## OPINION

B. FLETCHER, Circuit Judge:

Defendants Gilberto Baez Rivera ("Gilberto"), Rigoberto Baez Rivera ("Rigoberto"), Leonel Mendoza ("Mendoza") and Alice Espinoza ("Espinoza") appeal their convictions for conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 846. Espinoza also appeals her conviction for intentional use of a communication facility in causing and facilitating conspiracy to distribute a controlled substance in violation of 21 U.S.C. § 843(b). Defendants argue that the government failed to show necessity for a wiretap on two telephones and failed to properly minimize the various wiretaps it used in its investigation of the conspiracy.

Rigoberto also appeals his sentence of 168 months imprisonment on the ground that the district court, in calculating the applicable sentencing range under the United States Sentenc-

ing Guidelines, improperly applied a four-level enhancement to his offense level for his role as an "organizer or leader" pursuant to U.S.S.G. § 3B1.1. Rigoberto further argues that his sentence is unreasonable.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In August 2003, the Drug Enforcement Administration ("DEA") opened an investigation of what it called the Rivera Drug Trafficking Organization ("Rivera organization"). Most suspected members of the Rivera organization lived in Yakima, Washington. Gilberto was believed to be the leader of the organization, and his brother Rigoberto was believed to be a key member. Mendoza and Espinoza, Gilberto's girlfriend, were also believed to be involved in the Rivera organization.

While the DEA applied for and obtained three separate wiretap authorizations, the only wiretap application challenged on appeal is a March 14, 2005 application by Assistant United States Attorney George Fruchterman ("AUSA Fruchterman"). The application was for a wiretap on two mobile telephones: "Target Telephone 1," which the DEA believed was being used by Jerardo Rivera, brother of Gilberto and Rigoberto and a suspected narcotics distributor for the Rivera organization; and "Target Telephone 2," which the DEA believed was being used by Rigoberto. The application was supported by an affidavit by DEA Special Agent John Schrock, who was the lead agent in the Rivera investigation.

In the affidavit, Agent Schrock explained that a confidential source, referred to as CS5, had engaged in numerous narcotics-related conversations with Jerardo over Target Telephone 1 in the course of negotiating four separate controlled purchases of cocaine. Agent Schrock also explained that, based on pen register analysis and physical surveillance, he

believed that Jerardo had coordinated one of the controlled purchases with Rigoberto, and that Rigoberto had used Target Telephone 2 in the process.

The affidavit also stated that pen register analysis on both telephones indicated that Jerardo and Rigoberto were in frequent contact with various other suspected members of the Rivera organization, including Gilberto, Mendoza, Sabino Rivera, who was believed to facilitate the Rivera organization's money laundering, Tony Cuevas, a suspected narcotics distributor for the Rivera organization, and Alice Sambrano, who in 1996 had been stopped at the Mexico-United States border in a car containing 86.5 pounds of marijuana. In addition, telephone toll records showed that Target Telephone 2 had been used to place out-of-state, calling card and international calls, which indicated that it might have been used to contact sources of supply and points of distribution for narcotics.

In the affidavit, Agent Schrock explained why, in his opinion, use of the wiretap was the only available investigative technique reasonably likely to achieve the purposes of the Rivera investigation. Those purposes were (1) obtaining enough evidence "to prove beyond a reasonable doubt" that the persons expected to be intercepted, as well as others yet unknown, were committing various narcotics-related offenses; and (2) obtaining "critical information" about: the full scope of the Rivera organization's operation, including the identities and roles of "persons involved in transporting, unloading, storing, and supervising the delivery" of narcotics; the identities of "narcotics suppliers" to the Rivera organization; and the money laundering operation, specifically who controls the "disposition of proceeds generated by narcotics trafficking" and "where the proceeds ultimately go."

The district court (Suko, J.) authorized the wiretap on March 14, 2005.

Between March 15 and May 3, 2005, the DEA carried out the various authorized wiretaps. Special Agent Jacob Gilliam was the agent mainly in charge of the monitors who listened to the intercepted calls. A memorandum containing instructions for minimizing the wiretap had been prepared by AUSA Fruchterman.

Following the termination of the wiretaps, the government in an indictment and superseding indictment charged twenty-one persons, including Defendants, with conspiracy to distribute a controlled substance and other offenses related to drug trafficking.

Several of the persons charged, including Gilberto and Mendoza, filed motions to suppress wiretap evidence based on failure to show that the wiretaps were necessary and failure to properly minimize them. All other defendants joined in the motions. The district court (Shea, J.) held hearings on the suppression motions and denied them.

Gilberto, Rigoberto and Mendoza pleaded guilty to count one of the superseding indictment—conspiracy to distribute a controlled substance (methamphetamine) in violation of 21 U.S.C. § 846—but reserved the right to appeal the denial of their suppression motions based on lack of necessity and failure to minimize the wiretaps. The district court sentenced Gilberto, Rigoberto, and Mendoza to prison terms of 192 months, 168 months, and 60 months, respectively.

Espinoza was tried by jury. The jury returned a verdict of guilty as to counts one and twenty-one of the superseding indictment—conspiracy to distribute a controlled substance (methamphetamine) in violation of 21 U.S.C. § 846, and intentional use of a communication facility in causing and facilitating conspiracy to distribute controlled substances in violation of 21 U.S.C. § 843(b). The district court sentenced Espinoza to prison terms of 30 months for each count, to be served concurrently.

## II.  DISCUSSION

### A.  Necessity of the Wiretap

Defendants argue that the government failed to demonstrate that the wiretap on Target Telephones 1 and 2 was necessary. We disagree.

### 1.  Applicable Standards

**[1]** Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522. "To obtain a wiretap, the government must overcome the statutory presumption against this intrusive investigative method by proving necessity." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005) (citing *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001)). The necessity requirement for wiretap orders derives from 18 U.S.C. § 2518(1)(c) and (3)(c).[1] *See Gonzalez, Inc.*, 412 F.3d at 1112.

**[2]** In reviewing a district court's denial of a motion to suppress where that motion asserts lack of necessity for a wiretap, we review de novo whether an application for a wiretap order is supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c). *United States v. Staves*, 383 F.3d 977, 980 (9th Cir. 2004) (citing *Blackmon*, 273 F.3d at 1207). Next, we review for abuse of discretion the issuing judge's conclusion that the wiretap was

---

[1]Section 2518(1)(c) provides in relevant part that each wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." 18 U.S.C. § 2518(1)(c).

Section 2518(3)(c) provides in relevant part that a judge may approve a wiretap if he or she "determines on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." 18 U.S.C. § 2518(3)(c).

necessary. *United States v. Lynch*, 437 F.3d 902, 912 (9th Cir. 2006) (en banc).

### 2. *Whether the Affidavit Contains a Full and Complete Statement of the Facts*

**[3]** In reviewing whether an affidavit contains a full and complete statement of facts in compliance with § 2518(1)(c), we assess whether the affidavit attests that adequate investigative tactics were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or too dangerous. *Gonzalez, Inc.*, 412 F.3d at 1111. "As a general rule, proof that law enforcement officials either lied or made reckless misstatements in affidavits to secure a warrant or order does not in and of itself invalidate that warrant or order, or compel suppression of evidence obtained upon its execution. But false statements that are material in causing the warrant to issue will invalidate it." *United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985).

**[4]** Agent Schrock's 45-page affidavit adequately describes the DEA's use of various investigative techniques throughout its 19-month investigation of the Rivera organization, explains why those techniques did not achieve the purposes of the investigation, and explains why the DEA did not use other investigative techniques because they were deemed unlikely to achieve those purposes.

The affidavit explains that the DEA and local authorities in Yakima used six "confidential sources" and four "sources of information" to obtain information about the Rivera organization. For example, one confidential source identified Rigoberto as the user of Target Telephone 2 and was instructed by Gilberto to earn money for him by selling cocaine; a second purchased a pound of marijuana from Tony Cuevas and identified him as a subordinate Yakima-based distributor for the Rivera organization; a third attempted to infiltrate the Rivera organization by renting an apartment from Sabino Rivera and

purchasing three pounds of methamphetamine from Margarita Sanchez; and a fourth, CS5, had numerous narcotics-related conversations with Jerardo Rivera over Target Telephone 1 and made four controlled cocaine purchases from Jerardo between November 2004 and January 2005, which also involved Mendoza and Rigoberto.

The affidavit also explains, however, that these confidential sources and sources of information were unlikely to help the DEA verify the identities of the other members of the Rivera organization and understand the organization's methods of money laundering. For example, one of the confidential sources, who had once been threatened with a gun by Gilberto, was considered to be in too much danger; several of the confidential sources and sources of information were unwilling or too scared to infiltrate the Rivera organization or even continue cooperating with law enforcement; and one confidential source and one source of information were convicted of crimes and deported.

Defendants contend that the affidavit should have provided more detail, such as *why* a confidential source was considered to be in too much danger, *why* other confidential sources were unwilling or too scared to infiltrate the Rivera organization, and *why* the government chose to deport a confidential source and a source of information. However, we have not required such a level of detail in a wiretap application.

In *Blackmon*, we found inadequate an affidavit's explanation that four previously-used informants were insufficient to meet the purpose of the investigation because informants "typically only possess limited knowledge concerning the scope of the criminal enterprise" and because subjects of an investigation "know that it is [in] their best interest to reveal as little as possible to others concerning how their business is conducted." 273 F.3d at 1210. We concluded that this general explanation was insufficient to prove necessity because it "would be true of most or all drug conspiracy investigations,

and the limitations on the usefulness of informants, no matter how successful or potentially successful to the particular operation, would support the necessity of a wiretap." *Id.*

We reached the opposite conclusion in *United States v. Canales Gomez*, where the affidavit explained that the continued use of confidential informants was unlikely to be successful because the informants were in custody, were no longer in contact with members of the target drug trafficking organization, had been denied access to suppliers and customers, and were unaware of relevant trafficking locations or the scope of the full conspiracy. 358 F.3d 1221, 1225 (9th Cir. 2004). The affidavit thus concluded that any temporary release of the informants would have been fruitless because no long-term buyer-seller relationship could have been developed, because any attempt by the informants to re-contact the organization would have been suspicious and dangerous, and because the informants would have been unable to provide timely, comprehensive information regarding the current trafficking operations. *Id.* We found that explanation to be sufficient. *Id.*

**[5]** Like the affidavit in *Canales Gomez*, and unlike that in *Blackmon*, the affidavit here did more than recite the inherent limitations of using confidential informants; it explained in reasonable detail why each confidential source or source of information was unable or unlikely to succeed in achieving the goals of the Rivera investigation. That is sufficient. While we do agree with Defendants that the affidavit failed to explain why CS5—who had purchased increasing amounts of cocaine from Jerardo and others only a few months before the DEA applied for the wiretap—was believed incapable of infiltrating the Rivera organization to the extent necessary to identify Jerardo's source of supply and his associates (besides Mendoza and Rigoberto) in importing, processing and selling cocaine, we conclude that this failure, given the level of detail in the affidavit as a whole, does not render the affidavit inadequate for purposes of § 2518(1)(c). *See United States v. Fernandez*, 388 F.3d 1199, 1237 (9th Cir. 2004) (concluding that

wiretap affidavit satisfied the requirements of § 2518(1)(c) despite the fact that it included some statements merely describing the inherent limitations of traditional investigative techniques); *United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990) ("The presence of conclusory language in the affidavit will not negate a finding of necessity if the affidavit, as a whole, alleges sufficient facts demonstrating necessity."); *cf. Blackmon*, 273 F.3d at 1208 (suppressing wiretap evidence in part because "the [wiretap] application contains *only* generalized statements that would be true of any narcotics investigation") (emphasis added).

**[6]** The affidavit also includes sufficient case-specific detail in its discussion of physical surveillance. The affidavit states that the DEA conducted physical surveillance of target residences and businesses on numerous occasions in order to corroborate information provided by confidential sources and identify residences of suspects, interactions between suspects, and possible methods of laundering narcotics proceeds. The affidavit describes how, for example, physical surveillance allowed the DEA to verify that Gilberto used a particular mobile telephone number that was subscribed to by Espinoza and to determine that Rigoberto was likely involved in at least one of Jerardo's cocaine sales to CS5. However, the affidavit explains that despite the usefulness of physical surveillance, it did not significantly broaden investigators' understanding of how the Rivera organization functioned, did not verify relationships between suspects, and did not provide sufficient evidence to warrant the arrest or prosecution of the organization's members.

We disagree with Defendants that the affidavit is misleading in stating that physical surveillance did not verify relationships between suspects or provide sufficient evidence to prosecute the organization's members. While it is true that the affidavit describes the *suspected* roles of fifteen persons in the Rivera organization and certain relationships among them, it is apparent that in many cases the DEA required additional

evidence to *verify* those relationships. Moreover, while physical surveillance in combination with the use of confidential sources may have provided the government with enough evidence to arrest and prosecute a few members of the Rivera organization for drug crimes, it is clear from the affidavit that the government required additional evidence to accomplish its purpose of uprooting the entire drug trafficking conspiracy.

We also disagree with Defendants that the affidavit relies only on a description of the inherent limitations of physical surveillance in explaining why that investigative technique was unlikely to further help achieve the purposes of the investigation. The affidavit provides three case-specific reasons why in the Rivera investigation physical surveillance was particularly unlikely to be more successful: (1) many members of the Rivera organization had their telephone bills sent to an unused family residence or to a girlfriend's residence so as not to disclose their current residential address to law enforcement; (2) many members of the Rivera organization lived in close-knit communities whose residents included illegal aliens who often were suspicious of law enforcement and would tip off other residents who they believed were targets of surveillance; and (3) members of the Rivera organization were suspicious of law enforcement surveillance and employed countermeasures in attempts to defeat such surveillance. Moreover, the affidavit describes two specific instances in which Rigoberto and Mendoza employed such countermeasures. Thus, the affidavit does more than describe the inherent limitations of physical surveillance. It also "specif[ies] why, in the particular case at hand, these inherent limitations will [cause ordinary investigative techniques to] be insufficient." *Blackmon*, 273 F.3d at 1210.

We further disagree with Defendants that the affidavit's discussion of the use of grand jury subpoenas either lacks sufficient case-specific detail or contains a material omission. In explaining why the DEA did not subpoena conspirators to testify before a grand jury during the Rivera investigation, the

affidavit does recite the inherent limitations of that investigative tool, including that the service of grand jury subpoenas on conspirators will alert those conspirators, and probably other conspirators as well, to the fact that an investigation is ongoing, which in turn may compromise the investigation. However, the affidavit also illustrates the anticipated effect of those inherent limitations on the Rivera investigation: a confidential source informed Agent Schrock that in 2003, shortly after Miguel Rivera, father of Gilberto and Rigoberto, had been served with a grand jury subpoena to testify about a different drug trafficking organization, Gilberto fled to Tijuana, Mexico, because he feared that law enforcement might arrest him for his role in narcotics trafficking. Thus, the affidavit does more than recite the inherent limitations of using grand jury subpoenas as an investigative tool; it also demonstrates that those limitations were likely to prevent the DEA from successfully using that investigative tool in the Rivera investigation.

Moreover, while the affidavit omits the information that Gilberto's wife and children lived in Tijuana, we disagree with Defendants that this omission is material. Defendants contend that, if the issuing court had been provided that information, it could have concluded that Gilberto traveled to Tijuana not for fear of being arrested but instead to visit his family. However, as the district court explained in ruling on Defendants' suppression motions, the fact that Gilberto's family lived in Tijuana did not "discount the fact that a confidential informant had specifically advised [Agent Schrock] that Gilberto's travel to Mexico was a direct result of the grand jury subpoena." Accordingly, the fact that Gilberto's family lived in Tijuana would likely not have affected the issuing court's determination that the wiretap was necessary, and the omission of this fact from the affidavit was therefore not material. *Cf. Ippolito*, 774 F.2d at 1485-86 ("[I]t is necessary to evaluate the hypothetical effect of knowledge of the existence of a potentially useful informant on the original district court's determination that a wiretap was necessary. If it would

have no effect, then the misstatement would not be material.").

[7] We further conclude that the affidavit provides sufficient case-specific detail in explaining why the DEA was unlikely to achieve the objectives of the Rivera investigation by using, or continuing to use, undercover agents, trash runs, interviews with members of the Rivera organization, and pen registers and trap-and-trace devices. We do agree with Defendants that the affidavit fails to explain in sufficient case-specific detail why subpoenaing financial records held by non-conspirators would not achieve the investigation's goal of understanding the organization's money laundering operation and why the execution of search warrants was unlikely to yield a major quantity of narcotics or narcotics proceeds, especially since two police searches of Gilberto's residence prior to the start of the investigation had yielded large amounts of narcotics and cash. Nonetheless, considering the affidavit's detailed discussion of most of the other investigative techniques that the DEA used or considered using, we find these failures not to be fatal to the affidavit as a whole. *See Fernandez*, 388 F.3d at 1237; *Torres*, 908 F.2d at 1423.

[8] Finally, we find it immaterial that the affidavit omitted a discussion of the use of global positioning tracking devices. The record reveals that the DEA placed one such device on Rigoberto's vehicle but only after the wiretap application and affidavit had already been submitted, and that Rigoberto soon learned about the presence of the device and stopped driving that vehicle. Thus, including those facts in the affidavit would likely not have affected the issuing court's necessity determination. *See Ippolito*, 774 F.2d at 1485-86.

[9] In sum, we conclude that the affidavit supporting the wiretap application contains a "full and complete statement" as required by 18 U.S.C. § 2518(1)(c).

*3.   Whether the Wiretap was Necessary*

When reviewing necessity, we employ a "common sense approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forgo such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use." *Gonzalez, Inc.*, 412 F.3d at 1112 (citation and internal quotation marks omitted).

**[10]** "Though 'the wiretap should not ordinarily be the initial step in the investigation, . . . law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap.' " *Canales Gomez*, 358 F.3d at 1225-26 (quoting *United States v. McGuire*, 307 F.3d 1192, 1196-97 (9th Cir. 2002)). "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.' " *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (quoting *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986)). Thus, "we have 'consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators.' " *McGuire*, 307 F.3d at 1198 (quoting *Torres*, 908 F.2d at 1422).

**[11]** It is clear that the DEA did not seek to use the wiretap as the initial step in the Rivera investigation but instead used numerous investigative techniques, and considered using several others, over the course of a 19-month investigation before applying for the wiretap. While the government could probably have relied on these techniques alone to successfully prosecute a few individuals, including Jerardo Rivera and Rigoberto, for drug crimes, the issuing court did not abuse its discretion in concluding that the wiretap was necessary to identify the full scope of the Rivera organization and "de-

velop an effective case" against its members. *See Decoud*, 456 F.3d at 1007.

This case is distinguishable from *Gonzalez, Inc.*, where we held that the government had failed to demonstrate necessity for a wiretap on the telephone of the main office of a bus company that the government suspected was being used in an alien smuggling ring. In that case, the government had already conducted a multi-year investigation into the alleged alien smuggling activities but then sought to intercept incriminating evidence linking the company's founder and other persons in the company's main office to those alien-smuggling activities. 412 F.3d at 1106-07. The affidavit supporting the wiretap application demonstrated that the government had conducted only limited investigation into the activities at the company's main office before applying for a wiretap. *Id.* at 1108. Specifically, the affidavit demonstrated that the government had conducted only five-days-worth of pen register and trap-and-trace analysis of the office's telephone and had conducted only limited physical surveillance of the office before abandoning its surveillance efforts. *Id.* at 1112. We concluded that the affidavit indicated that "the government side-stepped its responsibility to use promising traditional techniques when it began to investigate the [company's] office, and instead conducted only the most cursory investigation before seeking a wiretap." *Id.* at 1113-14.

**[12]** Here, the DEA conducted far more than a cursory investigation before applying for the wiretap. Over the course of 19 months, the DEA conducted physical surveillance of various targets of the investigation; conducted telephone information analysis of Target Telephones 1 and 2 and other telephone numbers associated with the Rivera organization; used several confidential sources to try to infiltrate the Rivera organization or purchase narcotics from it, including from Jerardo Rivera and Rigoberto; consulted with several sources of information to obtain information about the Rivera organization; used an undercover agent to gain information about

the Rivera organization's money laundering activities; collected trash at the residences of two members of the Rivera organization and attempted to collect trash at the residence of Rigoberto; and attempted to persuade Gilberto Mungia, a member of the Rivera organization, to cooperate with the Rivera investigation.[2] Thus, the DEA's pre-wiretap investigation was significantly more thorough than in *Gonzalez, Inc.*, and we find it to be sufficient.[3] *See, e.g.*, *United States v. Carneiro*, 861 F.2d 1171, 1178 (9th Cir. 1988) (upholding wiretap order where the DEA used informants, surveillance, pen registers and undercover agents before resorting to a wiretap).

Defendants contend that the DEA failed to demonstrate necessity because it did not use traditional investigative techniques as much as it could have. Specifically, Defendants contend that the DEA could have conducted physical surveillance in Tijuana, Mexico, where the DEA knew that Gilberto's family resided; could have used CS5 for a longer period of time in the hope that he would infiltrate the Rivera organization; and could have performed trash runs at residences of

---

[2]Because the purpose of the wiretap was to obtain evidence against the entire Rivera organization, we consider in our necessity analysis all the DEA's pre-wiretap investigative efforts directed at the Rivera organization —not only those efforts directed at the users of the two telephones for which the wiretap was sought. By contrast, in *Gonzalez, Inc.* we considered in our necessity analysis only the government's investigative efforts directed at the bus company's main office—and not its earlier efforts directed at the alien smuggling activities—because the purpose of the wiretap was to obtain evidence specifically against the employees who worked in that office. *See Gonzalez, Inc.*, 412 F.3d at 1107.

[3]As we explained in *Gonzalez, Inc.*, "the government may establish necessity for a wiretap by any of three, alternative methods. The government may show that traditional investigative procedures (1) have been tried and failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try." 412 F.3d at 1112. Because we conclude that the DEA showed that it had used an adequate array of traditional investigative techniques, we need not reach the question of whether the DEA made a sufficient showing that unused investigative procedures were unlikely to succeed or were too dangerous to be tried.

other members of the Rivera organization, for example by dressing up as trash collectors or using actual garbage collection employees to collect the trash. Defendants may well be correct. But we have repeatedly held that "law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *Canales Gomez*, 358 F.3d at 1225-26 (quoting *McGuire*, 307 F.3d at 1196-97); *Brone*, 792 F.2d at 1506.

Further supporting a finding of necessity here is the fact that the DEA was investigating a large drug trafficking conspiracy and was seeking to prosecute not only the main conspirators but also the Rivera organization's suppliers, distributors and other known and unknown members. *See McGuire*, 307 F.3d at 1198.

**[13]** While we agree with Defendants that the government could have—and perhaps should have—further utilized traditional investigative techniques before applying for the wiretap, we may not reverse simply because we might have decided not to grant the wiretap. We review the issuing court's decision to grant the wiretap for an abuse of discretion, *Lynch*, 437 F.3d at 912, and we conclude that the issuing court did not abuse its discretion here.

## B. Minimization of the Wiretaps

Defendants argue that the government failed to meet the statutory requirement that wiretapping "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5). Specifically, Defendants argue that (a) the DEA failed to put in place adequate monitoring procedures and failed to properly train the wiretap monitors, and (b) the DEA arbitrarily labeled calls as "pertinent" and made insufficient efforts to minimize non-pertinent calls. We reject Defendants' arguments.

*1.  Applicable Standards*

We review de novo a district court's conclusion that the government followed adequate minimization procedures. *See McGuire*, 307 F.3d at 1200 n.7; *Torres*, 908 F.2d at 1423. However, we review underlying factual issues for clear error. *Lynch*, 437 F.3d at 912.

**[14]** "Minimization requires that the government adopt reasonable measures to reduce to a practical minimum the interception of conversations unrelated to the criminal activity under investigation while permitting the government to pursue legitimate investigation." *McGuire*, 307 F.3d at 1199. The minimization techniques used "do not need to be optimal, only reasonable . . . ." *Id.* at 1202. Whether the government has conducted a wiretap in compliance with the statutory minimization requirement "will depend on the facts and circumstances of each case." *Scott v. United States*, 436 U.S. 128, 140 (1978).

The government has the burden to show proper minimization. *Torres*, 908 F.2d at 1423. However, because Defendants do not challenge the admission into evidence of any intercepted conversations on the ground that those conversations should have been minimized, we need only examine whether the government has shown a *prima facie* case of compliance with the minimization requirement. *See id.*

*2.  Adequacy of Monitoring Procedures and Training*

**[15]** It is apparent from the record that the DEA's monitoring procedures and its training of the monitors were adequate. The record reveals that all agents working on the case and all monitors were required to read Agent Schrock's affidavit, the court order for the wiretap, and the minimization memorandum written by AUSA Fruchterman. Moreover, AUSA Fruchterman personally instructed all agents and monitors present on the first day of the wiretap and he made efforts to

speak by telephone with the monitors who began working after the first day. In addition, a DEA agent sat down with each new monitor, had him read the affidavit, the court order and the minimization memorandum, asked him whether he had any questions, and had him confirm by signature that he had read the instructions. The DEA agent conducting these training procedures was almost always Special Agent Gilliam, who was in charge of monitoring when he was in the wire room, and who, himself, had been instructed on the minimization provisions by AUSA Fruchterman and Agent Schrock, the lead agent in the case.

As the district court observed in denying Defendants' minimization-related motions, the minimization memorandum instructed monitors: to immediately terminate interception of a call if no target subject or criminal associate was participating in the conversation; that a call could be intercepted for a "reasonable time, usually not more than two minutes, to determine whether the conversation concerns criminal activities," and; what to do if it was unclear whether a conversation related to criminal activity. Monitors were also instructed that if they had questions they could ask the on-site agent or, if the on-site agent was unavailable, contact AUSA Fruchterman, another Assistant United States Attorney, or Agent Schrock.

While monitors were not tested on their understanding of the documents they were required to read, all of them had worked on numerous wiretaps in the past and, as most calls were expected to be in Spanish, all monitors were Spanish speakers. In addition, the DEA tried to have an agent fluent in Spanish in the wire room at all times in order to review all calls intercepted by the monitors. Thus, Spanish-speaking agents would often listen to calls as they were coming in, would check whether the monitors were minimizing the calls at the appropriate times, and would compare call summaries being prepared by the monitors with what was being said in the call to which they were listening. While not all calls were reviewed by agents as the calls were coming in, an agent

reviewed all call summaries later on. Further, more seasoned monitors would many times listen in on calls being monitored by less experienced monitors or would be present while such calls were being recorded. In addition, DEA agents ensured there was an overlap between shifts of monitors so that important information about earlier intercepted calls could be transferred to the monitors starting the new shift.

While on occasion the only agent on duty may have left the wire room to go to the bathroom or get something to drink, the wire room was never without an agent for an extended period of time. The mobile telephone numbers of all the agents were written on a whiteboard in the wire room, the agents kept their mobile telephones on 24 hours a day, and the monitors were instructed to call if anything came up. The telephone numbers of government attorneys, including that of AUSA Fruchterman, were also written on the whiteboard.

We have found similar minimization procedures to be adequate. In *Torres*, the DEA instructed monitors on the requirements and need for minimization and required them to read and sign a copy of the minimization guidelines. 908 F.2d at 1423. In addition, a DEA agent and Assistant United States Attorney made themselves available on a twenty-four hour basis for consultation. *Id*. We held that the DEA had "adopted reasonable procedures to assure compliance with the minimization requirement." *Id*.

**[16]** Defendants argue, however, that the DEA failed to properly minimize the wiretap because it took insufficient steps to ensure that monitors would minimize conversations protected by the marital privilege. Specifically, they point out that the DEA did not make efforts to determine whether any of the wiretap targets were married and did not inform the monitors that Gilberto's wife lived in Mexico. We find Defendants' argument unpersuasive. The district court found, and the record confirms, that monitors were instructed not to listen to privileged calls, including calls between spouses. In addi-

tion, Special Agent Gilliam testified that the DEA was not aware, despite having reviewed various county and city databases, that any of the targets was married. While the DEA perhaps should have specifically investigated the marital status of the wiretap targets, Defendants cite no authority for the proposition that failure to do so renders the DEA's minimization procedures, as a whole, inadequate. Moreover, as Defendants point to no privileged conversations that they allege were improperly minimized, there is no indication that the monitors were insufficiently aware of how to minimize spousal communications.[4]

[17] Accordingly, we conclude that the DEA's monitoring procedures and its training of the monitors did not fall short of the requirements of 18 U.S.C. § 2518(5).

3.  *Whether the Calls Were Properly Labeled as Pertinent and Minimized*

[18] The record also refutes Defendants' contention that the government arbitrarily labeled calls as pertinent or failed to

---

[4]While Defendants contend that the DEA failed to properly minimize two intercepted conversations between Rigoberto and Edith Iniguez, they do not contend that Rigoberto and Iniguez were married or had a common-law marriage—only that they had children together. We need not decide which marital privilege applies in this case, as neither the "marital communications" privilege recognized by federal common law nor the Washington marital privilege statute covers conversations between individuals who merely have children in common. *See United States v. Griffin*, 440 F.3d 1138, 1143-44 (9th Cir. 2006) (explaining that the federal common law marital communications privilege "protects from disclosure private communications between spouses" and "covers . . . only those communications made during a valid marriage") (internal quotation marks and citation omitted); Wash. Rev. Code § 5.60.060(1) (2007) ("A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be without the consent of the other, examined as to any communication made by one to the other during marriage.").

make sufficient efforts to minimize non-pertinent calls. Special Agent Gilliam testified that monitors were instructed to label a call as pertinent if it concerned drug-related activity of any kind and that he, when he later reviewed the calls, would label a call pertinent if he thought the call was in any way related to drug activity or would assist the DEA in the ongoing investigation of the Rivera organization. Thus, the standard for whether a call should be labeled pertinent was clear and not arbitrary.

While Defendants point to two calls between Rigoberto and Edith Iniguez —one labeled pertinent and the other not—as evidence that intercepted calls were nonetheless labeled arbitrarily in practice, Special Agent Gilliam explained that, in his opinion, both calls were probably pertinent, but that one of them may have contained insufficient detail about drug trafficking activity for the monitor to label it as such. Nor does the fact that some DEA agents labeled more calls pertinent than did other agents demonstrate that the labeling was arbitrary. Despite the clear standard for determining whether a call should be labeled pertinent, such a determination is inevitably a judgment call. Special Agent Gilliam testified that while some agents might have labeled calls slightly differently than others, he did not recall any disagreement between agents about whether or not a call should be labeled pertinent. Thus, we conclude that the labeling of calls as pertinent was not arbitrary.

[19] Moreover, the fact that only 203 of 4,561 intercepted calls were minimized does not render the DEA's minimization efforts inadequate. While the record does not indicate how many of the intercepted calls the DEA labeled pertinent, Defendants do not assert that the DEA intercepted, but failed to minimize, any significant number of non-pertinent calls.[5]

---

[5]We note that the district court found that a significant number of calls did not contain conversations. For example, of 781 calls intercepted on one telephone line, only 475 contained conversations. Those calls, while non-pertinent, of course did not have to be minimized.

Thus, Defendants have not provided a basis for concluding that the DEA's minimization efforts were unreasonable. *Cf. United States v. Bennett*, 219 F.3d 1117, 1123-24 (9th Cir. 2000) (holding that interception was properly minimized where appellants contended that government failed to minimize only 267 of 7,322 intercepted calls); *Torres*, 908 F.2d at 1423 (holding that minimization efforts were reasonable where, of 1052 intercepted completed conversations, government failed to minimize "only a handful of calls").

Moreover, even assuming the DEA failed to minimize a significant number of non-pertinent calls, at least three facts in this case militate against finding the DEA's minimization efforts unreasonable. First, the Supreme Court has observed that "[i]n a case such as this, involving a wide-ranging conspiracy with a large number of participants, even a seasoned listener would have been hard pressed to determine with any precision the relevancy of many of the calls before they were completed." *Scott*, 436 U.S. at 142. Thus, the DEA's minimization efforts are not rendered unreasonable by the fact that monitors may have declined to minimize calls because they mistakenly believed them to be related to activities of the Rivera organization. *See id.* Second, we have held that "[l]aw enforcement is entitled to latitude to scrutinize messages by conspirators, because such messages may contain double-meanings and implied purposes, or even be conveyed in secret code." *McGuire*, 307 F.3d at 1201. Here, the district court found that the members of the Rivera organization "utilized code words" in their conversations. Therefore, the DEA's minimization efforts are also not rendered unreasonable by the fact that monitors may have declined to minimize calls because they mistakenly believed them to contain code words referring to drug trafficking activities. Third, the district court found that "the monitors were able to minimize a higher percentage of calls as the authorization period progressed because the agents and monitors kept notes on a dry erase board listing code words that were used, nicknames for individuals, relationships between individuals, and what individu-

als were associated with what telephone number." Dist. Ct. Order (3/9/06) at 9. We agree with the district court that this fact weighs in favor of finding that the DEA's minimization efforts were reasonable.

**[20]** Accordingly, we conclude that the DEA's labeling of calls as pertinent and its efforts to minimize non-pertinent calls were adequate for purposes of 18 U.S.C. § 2518(5).

## C.  Enhancement of Rigoberto's Offense Level

Rigoberto argues that the district court erred by enhancing his offense level by four levels under U.S.S.G. § 3B1.1(a) because the record does not support a finding that he was an "organizer or leader" of the Rivera organization. We disagree.

### 1.  Applicable Standards

**[21]** Section 3B1.1 of the Sentencing Guidelines provides for varying levels of enhancement depending upon a defendant's control over criminal activity and the number of people involved:

> (a)  If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

> (b)  If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

> (c)  If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. The application notes provide:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, cmt. 4.

We review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Garcia*, 497 F.3d 964, 969 (9th Cir. 2007). The district court's findings of fact are reviewed for clear error. *Id.* Thus, we review for clear error the district court's finding that Rigoberto was an organizer or leader. *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996). We have noted an intracircuit conflict regarding whether we review application of the Guidelines to the facts for an abuse of discretion or de novo. *See Garcia*, 497 F.3d at 969; *United States v. Staten*, 466 F.3d 708, 713 n.3 (9th Cir. 2006). However, because our decision would be the same under either standard of review, we need not resolve the conflict here.

"For a four-point upward adjustment to be appropriate, a preponderance of the evidence must support a finding that the defendant was an organizer or leader, 'not merely that the defendant was more culpable than others who participated in the crime.' " *Avila*, 95 F.3d at 889 (quoting *United States v. Harper*, 33 F.3d 1143, 1150 (9th Cir. 1994)).

**[22]** "We have upheld upward adjustments under § 3B1.1(a) in 'cases involv[ing] defendants who, the evidence

showed, exercised some degree of control or organizational authority over others.' " *Garcia*, 497 F.3d at 969-70 (quoting *Avila*, 95 F.3d at 890) (alteration in *Garcia*). "Such control or authority over others is required to impose the four-level enhancement under 3B1.1(a), for it is 'precisely what distinguishes a leader or an organizer [under § 3B1.1(a)] from a manager or supervisor' under § 3B1.1(b)." *Garcia*, 497 F.3d at 970 (quoting *Avila*, 95 F.3d at 890 n.6) (alteration in *Garcia*).

## 2. *Analysis*

**[23]** Here there was ample evidence that Rigoberto exercised authority over others. While the Presentence Investigation Report ("PSR") recommended a three-level "manager or supervisor" enhancement under § 3B1.1(b), and while the government did the same pursuant to its plea agreement with Rigoberto, both the undisputed evidence in the PSR and the testimony of Agent Schrock at the sentencing hearing establish that Rigoberto exercised authority over several individuals. For example:

- Rigoberto directed his girlfriend Maria Mayorquin-Pulido and Alice Sambrano to travel to California and Mexico and bring back narcotics for him.

- Rigoberto directed Mayorquin-Pulido to deliver narcotics in the Seattle area.

- Rigoberto directed Mayorquin-Pulido and Daniel Cervantes to make several wire transfers to Los Angeles so that narcotics could be sent from there to Yakima.

- Sergio Gallegos admitted to serving as a go-between for Rigoberto in several drug deals and

to functioning as a straw owner for the purchase of Rigoberto's vehicle.

- Edith Iniguez, another girlfriend of Rigoberto's, admitted to handing off packages that Rigoberto had left at their residence to third parties and to transferring the monies she collected to Rigoberto.

Moreover, our case law has considered relevant whether the defendant exercised decision making authority in the procurement and distribution of narcotics. Thus, in *United States v. Ponce*, 51 F.3d 820 (9th Cir. 1995), we upheld an organizer/leader enhancement because defendant McTague, in addition to having managed two co-conspirators, had overseen the procurement and distribution of large amounts of cocaine in the Los Angeles area and had "repeatedly exercised decisionmaking authority and functioned in an organizational role in determining when, where, and to whom the drugs would be sold." *Id*. at 827. Likewise, in *United States v. Salcido-Corrales*, 249 F.3d 1151 (9th Cir. 2001), we upheld an organizer/leader enhancement because the defendant, in addition to having exercised authority over others, had coordinated the distribution of drugs received from out-of-state sources, had initiated drug deals with an undercover officer, had negotiated the terms of the drug deals, and had set their locations and times. *Id*. at 1154-55. The application notes to § 3B1.1 confirm that the exercise of decision making authority is a relevant factor in determining the defendant's role in a criminal enterprise. *See* U.S.S.G. § 3B1.1, cmt. 4 ("Factors the court should consider include the exercise of decision making authority . . . .").

**[24]** Here, the record contains ample evidence that Rigoberto exercised decision making authority in the procurement and distribution of narcotics. In addition to the examples given above, the record reveals that:

- In August 2004, a confidential source met with two people to discuss the purchase of methamphetamine, and the source was told that "Rigo" was in charge of methamphetamine.

- Jerardo Rivera frequently arranged to meet with Rigoberto to obtain drugs and remit monies. There was also evidence that Jerardo stored narcotics at his apartment on behalf of Rigoberto.

- In March 2005, Elisa Mercado asked Rigoberto whether he and the Rivera organization wanted to purchase a shipment of methamphetamine at a particular price, and Rigoberto responded that he was not interested in procuring the drugs at that price.

- In March 2005, Rigoberto requested that Alice Sambrano travel to California, take money with her, and return to Yakima with a shipment of narcotics. Rigoberto informed Sambrano that she would be bringing back marijuana.

- In May 2005, Jacob Martinez-Villavicencio informed Rigoberto that he had money he owed and asked whether Rigoberto would give him more drugs. Rigoberto indicated that he would need the money for the drugs the same day and directed Martinez-Villavicencio to drop the money off at his house.

Thus, Rigoberto's role in the Rivera organization is distinguishable from that of the defendant in *Avila*, where we reversed an organizer/leader enhancement because the defendant merely functioned as a "go-between" by negotiating, for a fee, the sale of five kilograms of cocaine between the seller and a buyer, and then later, accompanied by two co-

conspirators, delivering the cocaine to the buyer. 95 F.3d at 888, 890.

However, in arguing that he was not an organizer or leader, Rigoberto points to the fact that his probation officer testified at the sentencing hearing that he had "gained the impression that Gilberto was more of a leader/organizer, more of a hands off [sic], but kind of directed activities, where Rigoberto was more of the day-to-day supervisor, more hands on." Rigoberto also points to the fact that he had substantially fewer assets in his name than his brother Sabino Rivera and that Agent Schrock's affidavit in support of the wiretap application merely described him as a "key member" of the Rivera organization.

We find Rigoberto's argument unpersuasive. First, the probation officer conceded that it was a "difficult judgment call to make" as to whether Rigoberto was an organizer/leader or a manager/supervisor, and the district court, based on its thorough familiarity with the case, concluded that "the evidence is full and complete that [Rigoberto] was an equal player with his brother [Gilberto]." Second, the fact that Rigoberto may have been more responsible for day-to-day operations than Gilberto does not mean that Rigoberto was not also a leader or organizer. The application notes to § 3B1.1 explain that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, cmt. 4. Indeed, in *Ponce*, we upheld the organizer/leader enhancement for defendant McTague despite the fact that, while he had overseen the procurement and distribution of cocaine in the Los Angeles area, his father-in-law had been "the patriarch of the family smuggling business and oversaw its general operation" and had managed another part of the business as well. 51 F.3d at 825, 827.

The fact that Rigoberto had fewer assets in his name than Sabino does not negate a finding that Rigoberto was an organizer or leader, especially considering that Sabino was

believed to be in charge of money laundering and Rigoberto was believed to keep his assets (including a residence and a vehicle) in the names of other persons. The fact that Rigoberto was described as a "key player" in Agent Schrock's affidavit also does not negate his role as an organizer or leader.

**[25]** Accordingly, we conclude that the district court did not clearly err in finding that Rigoberto was an organizer or leader on the grounds that he was "an equal to [his] brother [Gilberto] in many ways" and that his "role was extensive, major and considerable in this involvement." Based on the district court's finding supported by evidence in the record, we conclude that the court correctly applied the four-level enhancement under § 3B1.1(a) to Rigoberto's offense level.

### D.   Reasonableness of Rigoberto's Sentence

Rigoberto argues that his sentence of 168 months imprisonment is unreasonable. We disagree.

#### 1.   Applicable Standards

We review the district court's imposition of a sentence for an abuse of discretion. *See United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc) (citation omitted).

In the district court's determination of a sentence, "the Guidelines are 'the starting point and the initial benchmark . . . .' " *Id.* at 991 (quoting *Kimbrough v. United States*, ___ U.S. ___, 128 S. Ct. 558, 574 (2007)). The district court should then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence suggested by the parties. *Carty*, 520 F.3d at 991. Thus, the district court "should consider the nature and circumstances of the offense and the history and characteristics of the defendants; the need for the sentence imposed; the kinds of sentences available; the kinds of sentence and the sentencing range established in the Guidelines; any pertinent policy statement issued by the Sen-

tencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims." *Id.* (citing 18 U.S.C. § 3553(a)(1)-(7); *Gall v. United States*, ___ U.S. ___, 128 S. Ct. 586, 596-97 n.6 (2007)).

The district court may not presume that the guidelines range is reasonable, but must make an individualized determination based on the facts. *Carty*, 520 F.3d at 991. Once the sentence is selected, the district court must explain it sufficiently to permit meaningful review. *Id.* at 992. However, "[t]he district court need not tick off each of the § 3553(a) factors to show that it has considered them." *Id.*

"Appellate review is to determine whether the sentence is reasonable; only a procedurally erroneous or substantively unreasonable sentence will be set aside." *Id.* at 993 (citation omitted). While our circuit does not presume on appeal that a sentence within the Guidelines range is reasonable, we have recognized that a sentence within the Guidelines range " 'will usually be reasonable . . . .' " *Id.* at 994 (quoting *Rita v. United States*, 551 U.S. ___, 127 S. Ct. 2456, 2465 (2007)). "We may not reverse just because we think a different sentence is appropriate." *Carty*, 520 F.3d at 993 (citation omitted).

### 2.   *Analysis*

The district court followed the proper procedure in determining Rigoberto's sentence. It first correctly calculated the applicable Guidelines range as 168 to 210 months, based on a base offense level of 35 and a Category I criminal history. The district court then provided the parties an opportunity to argue for an appropriate sentence: Rigoberto requested a sentence of 120 months, the statutory minimum, *see* 21 U.S.C. §§ 841(b)(1)(A), 846, while the government recommended a sentence of 151 months.

After noting that it could impose a sentence anywhere between 120 months and the statutory maximum of life imprisonment, *see id.*, the district court considered the § 3553(a) factors.

The court addressed the following factors: the nature and circumstances of the offense; Rigoberto's history and characteristics; the need for the sentence imposed; the kinds of sentences available to the court; and the need to avoid unwarranted sentence disparities. While the district court did not address all of the § 3553(a) factors, it was not required to do so. *Carty*, 520 F.3d at 992.

Based on its consideration of the § 3553(a) factors, the district court concluded that a sentence below the Guidelines range was not appropriate. Instead, the court imposed a sentence at the bottom of the Guidelines range, 168 months.

Rigoberto argues that the sentence was unreasonable because: his criminal history consists only of misdemeanors; his involvement in the Rivera organization was shorter than that of his brother, Gilberto; he has demonstrated remorse; by pleading guilty, he has resigned to the hardship of being away from his children for a long time; unlike his brothers, Rigoberto is a permanent resident of the United States, but he accepts the deportation consequences of his plea; he completed the 11th grade and worked two jobs while in school; and he is indigent.

**[26]** We find Rigoberto's argument ultimately unpersuasive. The district court took into account Rigoberto's criminal history and acceptance of responsibility in calculating the applicable Guidelines range. Moreover, in imposing a lesser sentence on Rigoberto than it had on Gilberto, the district court took into account Rigoberto's shorter involvement in the Rivera organization. The district court also expressly considered the fact that Rigoberto had performed some honest work and had several children. Finally, the district court relied on

Rigoberto's lack of funds in deciding not to impose a fine. We conclude that the district court adequately took these facts into account in imposing a sentence at the bottom of the sentencing range. Nor are we convinced that the district court should have imposed a lower sentence simply because Rigoberto will be deported following the completion of his sentence. In short, "we see nothing unusual about [Rigoberto's] circumstances to compel a lower sentence than the low-end of the Guidelines range." *Carty*, 520 F.3d at 996.

**[27]** Accordingly, we conclude that the district court did not abuse its discretion in imposing a sentence of 168 months imprisonment.

### III. CONCLUSION

We affirm Defendants' convictions and Rigoberto's sentence, and affirm the judgments.

**AFFIRMED.**