**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RODRICK CARDALE REED, aka
Boulevard, Li'l Rod,
  *Defendant-Appellant.*

No. 06-50040

D.C. No.
CR-03-00084-
VAP-1

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

GEORGE WILLIAMS, a/k/a JIMMY
WILLIAMS, GEORGE JUNE, GEORGE
WILSON AND JAMES WILLIAMS,
  *Defendant-Appellant.*

No. 06-50048

D.C. No.
CR-03-00084-
VAP-24

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RICHARD DARNELL JOHNSON, a/k/a
RICHARD JOHNSON,
  *Defendant-Appellant.*

No. 06-50302

D.C. No.
CR-03-00084-
VAP-10

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

10161

Argued and Submitted
October 24, 2008—Pasadena, California

Filed August 4, 2009

Before: Harry Pregerson, Cynthia Holcomb Hall, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

## COUNSEL

Joseph T. Vodnoy of Los Angeles, California, for defendant-appellant, Rodrick Cardale Reed.

Alissa Sawano Peterson of Irvine, California, for defendant-appellant, Richard Darnell Johnson.

Robinson D. Harley, Jr. of Santa Ana, California, for defendant-appellant, George Williams.

Shannon P. Ryan, Assistant United States Attorney for the Central District of California, Los Angeles, California, for appellee, United States of America.

## OPINION

N.R. SMITH, Circuit Judge:

Rodrick Reed (Case No. 06-50040), George Williams (Case No. 06-50048), and Richard Johnson (Case No. 06-50302) appeal their convictions and sentences following a jury trial. Each Appellant was convicted of conspiracy crimes involving the manufacture and distribution of phenylcyclohexylpiperidine ("PCP"). Reed was also convicted of conspiracy to possess firearm silencers. The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm the judgment of the district court and affirm the convictions and sentences of each Appellant.[1]

---

[1]Concurrent with this opinion, we have filed separate memorandum dispositions in the companion cases of *United States v. Jackson*, No. 06-50354 and *United States v. Green*, No. 06-50069.

Reed, Williams, and Johnson primarily assert that the district court erred in denying their motion to suppress wiretap evidence for Target Telephone No. 10 ("TT10"). In affirming their convictions, we hold (1) that the Government's wiretap application satisfied the necessity requirement; (2) the district court did not err in finding that the Government had not intercepted telephone calls on a line for which there was no court order; (3) the Government was not required to seal call data content ("CDC") and it timely sealed the wiretap recordings under § 2518(8);[2] and (4) the Government did not violate the statutory wiretap monitoring requirements of § 2518(5). Appellants raise additional issues regarding access to an expert witness (Reed), destruction of witness interview notes (Williams and Johnson), admission of expert testimony regarding "drug jargon" (Johnson), sufficiency of the evidence (Williams), adequacy of jury instructions (Williams), and admission of prior felonies for sentencing (Williams). We affirm the district court on each of these issues.

## FACTUAL BACKGROUND

Appellants' convictions arise from the Government's investigation of a PCP manufacturing and distribution operation in central California. In May 2002, the Government acquired information from an informant that Reed and others were manufacturing and distributing PCP. In November 2002, the informant communicated with Reed and his associate, Kim Stinson, about purchasing PCP. Reed made arrangements for the sale. In February 2003 (under law enforcement surveillance), the informant purchased a half gallon of PCP from Reed's associate, Anthony Piggue.

---

[2]Statutory references to 18 U.S.C. § 2518, unless otherwise noted, omit "18 U.S.C." from the citation.

## I.  Adelanto Drug Lab.

On March 21, 2003, local law enforcement discovered a PCP drug lab near Adelanto, California. At the lab, officers seized full-face respirators and various containers, containing about four pounds of crystalline PCP, and other chemicals used in manufacturing PCP. In a white van at the lab, officers found documents connecting the van to Reed, Stinson, and Henry Henderson. A receipt in the van showed Stinson's address on Lorraine Place, Rialto, California ("Lorraine residence").

## II.  Federal Wiretap.

Marvin McCaleb was supplying PCP precursor chemicals to Reed. While monitoring a telephone used by McCaleb, agents intercepted numerous calls made to McCaleb from Reed discussing PCP manufacturing. These calls originated from a telephone (TT10) subscribed to Terry Jackson. On April 4, 2003, the Government received a federal wiretap order for TT10 and began recording conversations confirming that Reed and his associates were manufacturing and distributing PCP and had firearms.

On April 8, 2003, the Government submitted an interim report to the authorizing judge. The Government informed the court that, although TT10 was used by Reed, within the first few hours of interception it became clear that TT10 was primarily used by Terry Jackson. Still, the Government had clear evidence that TT10 was being used in the furtherance of the PCP conspiracy. Upon filing an interim report with the court, the Government received permission to continue the wiretap of TT10.

## III.  Calls Intercepted on TT10 Provide Additional Evidence of PCP Operations.

Among the calls intercepted on TT10, agents recorded an April 6, 2003 call between Stinson and Appellant Williams,

in which Williams stated that he was lining up some out of state PCP purchasers for Reed.

On April 13, 2003, the Government intercepted calls involving Reed, Jackson, and Benjamin Beal, indicating that they were preparing to manufacture more PCP. Government agents watched the Lorraine residence and observed Reed directing others to load the white van with orange buckets and red canisters and handling a respirator. When the van departed the residence, the California Highway Patrol ("CHP") conducted a traffic stop where officers smelled strong chemical odors upon approaching the van and observed the buckets and canisters. Johnson was driving the van and told the CHP officer that the chemicals were used for carpet cleaning. After a hazmat team responded to the scene, it was determined that all of the chemicals and equipment related to the manufacture of PCP. In addition, the van contained 26.1 kilograms of PCP in crystalline form.

Two days after the van stop and seizure, Reed used TT10 to speak with several of his associates. Reed informed them of the seizure and directed them regarding future PCP manufacturing. Shortly after that call, Reed called Williams and discussed the van seizure and described his plans to make "grignard," a chemical reagent used in making PCP. Williams asked Reed about his plan, and counseled him on how to avoid law enforcement. Later that same day, Reed told another associate that the van had chemicals worth about $100,000, capable of making 150 to 200 gallons of PCP, worth a street value of about $2 million.

Later that month, deputies went to the Lorraine residence to further investigate the seizure of the white van. Deputies apprehended Reed and Jackson and questioned them about the white van. Stinson, cooperating with the Government, later testified that the white van belonged to Reed.

By May 2003, Reed was again manufacturing PCP. On May 13 and 14, Reed communicated with two other co-

defendants about the manufacturing operation. Sheriff's deputies later found five gallons of PCP buried underground on property owned by the father of one of these co-defendants.

## IV.  The Arrests.

On July 10, 2003, federal agents executed a series of search and arrest warrants for Reed and his co-defendants, arresting Reed at the Lorraine residence and retrieving $17,000 in cash in the trunk of a car at the residence.

An apartment shared by Johnson and Jackson was also searched. During the search, officers found documents in Johnson's name and a container containing trace amounts of PCP in Johnson's closet. Agents also searched the apartment belonging to Reed's girlfriend, where they located two 9mm firearms with attached silencers.

## V.  The Indictments.

On June 3, 2004, a federal grand jury returned a nine-count indictment charging more than twenty defendants, including Appellants, with drug and firearms violations. Count one charged each defendant with a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(c)(2), and 846 as well as 18 U.S.C. § 2 (conspiracy to manufacture, aid and abet the manufacture, possess with intent to distribute, and distribute more than 100 grams of PCP); count two charged Reed with a violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 18 U.S.C. § 2 (aiding and abetting the distribution of 100 grams or more of PCP; count three charged Reed and Johnson with a violation of 21 U.S.C. § 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2 (attempting and aiding and abetting the manufacture of 100 grams or more of PCP); count seven charged defendant Reed with a violation of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm); and count nine charged Reed with a violation

of 18 U.S.C. § 371 and 26 U.S.C. § 5861 (conspiracy to possess unregistered firearm silencers).[3]

## VI. The Motions To Suppress.

On July 8, 2004, Reed filed a motion to suppress the wiretap evidence recorded for TT10 and all derivative evidence. Reed argued that (1) the wiretap should have ceased when it was discovered that Terry Jackson was the primary user of the phone; (2) the wiretap was not properly sealed within two days under 18 U.S.C. § 2518(8)(a); and (3) the wiretap application failed to satisfy the necessity requirement. After a hearing on October 19, 2004, the court issued a written order denying the motion. Instead, the court found that the probable cause requirements were met in the original application. Further, given the traditional law enforcement techniques already employed and the nature of the conspiracy being investigated, the Government had shown necessity for the wiretaps. The district court also found that the Government complied with all statutory sealing requirements.

During the October 19, 2004 hearing on the first motion to suppress, Reed's attorney referenced a supplemental motion to suppress that he filed that morning, relating to an issue of illegal, warrantless wiretaps. Reed, joined by Williams, Johnson and other co-defendants, renewed the supplemental motion on May 23, 2005. The defendants asserted three bases for suppression: (1) that law enforcement colluded with the telephone company to (a) intercept calls on a telephone for which there was no court order and (b) alter wiretap and telephone billing records to conceal the illegal act; (2) that the Government failed to seal pen register and trap and trace data for TT10; and (3) that the wiretap monitoring was not properly supervised by authorized federal agents. The court held three hearings before denying the motion. The court found

---

[3]Counts four, five, six, and eight relate to other co-conspirators who are not parties to this appeal.

that (1) no illegal wiretapping took place; (2) the defense expert's testimony about anomalies in the records was not persuasive; (3) the missing CDC was the result of technical difficulties; (4) the CDC was not subject to the sealing requirements of the wiretap statute; and (5) the wiretap monitoring was done in compliance with the law.

## VII.   The Trial.

On July 7, 2005, the Government filed an information under 21 U.S.C. § 851 alleging that Reed had one previous, felony drug crime conviction, and that Williams had previously been convicted of two felony drug crimes. On July 12, 2005, the cases against Reed, Williams, and Johnson proceeded to trial. On July 20, 2005, Appellants moved to dismiss the indictment and strike testimony due to the Government's destruction of evidence (rough interview notes regarding cooperating Government witnesses). A written motion was filed on July 22, and the motion was denied on July 26, 2005. On July 28, 2005, Reed, Williams, and Johnson were convicted after a 10-day jury trial.

On December 5, 2005, Reed and Williams admitted the allegations of their prior felony drug convictions. On January 17, 2006, Reed and Williams were sentenced to life in prison. Johnson was sentenced to ninety-six months' imprisonment.

## DISCUSSION

## I.   APPELLANTS' MOTION TO SUPPRESS WIRETAP EVIDENCE WAS PROPERLY DENIED.

Appellants argue that the district court erred in denying their motion to suppress wiretap evidence, because (1) the Government failed to show necessity for the wiretap on TT10, as required by 18 U.S.C. §§ 2518(1)(c) & (3)(c); (2) the wiretap was not discontinued after the Government learned that TT10 was primarily used by Terry Jackson; (3) the Govern-

ment colluded with the telephone company to make illegally intercepted calls appear as though they were lawfully intercepted on TT10; (4) the Government failed to timely seal the recordings, and completely failed to seal the CDC for TT10; and (5) the wiretap was not properly monitored by federal agents. We address each of these arguments individually below.

In reviewing the denial of a motion to suppress evidence, we review the district court's factual findings for clear error. *See United States v. Hermanek*, 289 F.3d 1076, 1085 (9th Cir. 2002) (citation omitted). We review de novo "whether an application for a wiretap order is supported by a full and complete statement of the facts in compliance with § 2518(1)(c)." *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008) (citation omitted). We review for abuse of discretion the issuing judge's conclusion that the wiretap was necessary. *Id.* (citation omitted).

## A.   The Affidavit in Support of the Wiretap Application Met the Necessity Requirements of § 2518.

Appellants first argue that the wiretap of TT10 was not supported by an affidavit demonstrating necessity, because traditional investigative techniques had not been exhausted. They raise no challenge on appeal to the probable cause for the wiretap. We conclude that the district court did not err in finding that the affidavit satisfied the necessity requirement.

[1] The Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2522 (the "wiretap statute"), governs wiretap applications. After showing probable cause, the Government must also prove necessity by making "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." *Rivera*, 527 F.3d at 897 n.1 (quoting § 2518(1)(c)). The issuing judge may approve the wiretap if he or she determines

that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . ." *Id.* (quoting § 2518(3)(c)). The purpose of these requirements is to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

### 1. The Affidavit Contains a Full and Complete Statement of Facts in Compliance with § 2518(1)(c)

To determine whether an affidavit contains a full and complete statement of facts in compliance with § 2518(1)(c), we must "assess whether the affidavit attests that adequate investigative tactics were exhausted before the wiretap order was sought or that such methods reasonably appeared unlikely to succeed or too dangerous." *Rivera*, 527 F.3d at 898 (citation omitted).

**[2]** The Government's affidavit, in support of the wiretap application, describes prior investigative techniques and/or explains why these techniques had been or would be too dangerous or unsuccessful. The affidavit addresses other wiretaps, specific confidential informants, unfruitful physical surveillance, unproductive search warrants, interviews, trash searches, financial investigations, and pen registers/trap and trace devices/telephone tolls and subscriber information. In each case, the affidavit describes (1) the efforts undertaken and (2) why the results were insufficient or why a proffered technique would be unavailing in the context of this particular drug conspiracy investigation.

**[3]** Appellants contend that federal agents failed to follow new leads, new informants, and other new evidence provided by local law enforcement before applying for the wiretap. They also contend that the affidavit omitted law enforcement's success using normal investigative techniques, includ-

ing the use of a tracking device on Reed's white van. Reed contends that the investigative techniques listed in the affidavit were not directed at him individually, but related only to the broader conspiracy investigation. He therefore suggests that techniques such as informants, search warrants, and tracking devices were not fully utilized. These arguments are unconvincing in light of the Government's affidavit, which sufficiently sets forth reasons (1) why the informants would not produce further evidence (informants were in custody, were unwilling, lacked further information about Reed, or were no longer trusted by Reed), (2) why a search warrant would not be successful (Government did not know where Reed resided), and (3) why tracking devices were ineffective (Reed and associates constantly changed cars). Any omissions in the affidavit regarding the limited success achieved by traditional investigative techniques does not require suppression, because such omissions were not material in causing the wiretap warrant to issue. *See id.* at 898.

Accordingly, we conclude that the Government made a "full and complete statement" of prior investigative procedures and why these procedures failed or would be unlikely to succeed.

### 2. The District Court Did Not Abuse its Discretion in Finding Necessity for the Wiretap.

When reviewing the district court's finding of necessity, "we employ a 'common sense approach to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forgo such tactics based on the unlikelihood of their success or the probable risk of danger involved with their use.' " *Rivera*, 527 F.3d at 902 (quoting *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005)); *see also* S. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190 ("Merely because a normal investigative technique is theoretically possible, it does not follow that it is likely. What the

[necessity] provision envisions is that the showing be tested in a practical and commonsense fashion.") (internal citations omitted).

**[4]** "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to 'develop an effective case against those involved in the conspiracy.' " *Rivera*, 527 F.3d at 902 (quoting *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006)). "[L]aw enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." *United States v. McGuire*, 307 F.3d 1192, 1196-97 (9th Cir. 2002) (citation omitted). The issuing court has considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy. *Id.* at 1197-98. This court has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *Id.* at 1198 (quoting *United States v. Torrez*, 908 F.2d 1417, 1422 (9th Cir. 1990)).

This case involves a drug manufacturing and distribution conspiracy. The record is clear that the Government did not seek to use the wiretap as the initial step in its ongoing investigation, but instead employed numerous investigative techniques, relied on state and local law enforcement efforts,[4] and

---

[4]Appellants suggest that the investigative techniques employed by the Los Angeles Sheriff's department should be distinguished from those employed in the related federal investigation for purposes of determining necessity. They argue that regardless of the investigative techniques previously exhausted by state/local authorities, federal authorities must independently exhaust investigative techniques to satisfy the necessity requirement. We reject this argument. Federal and state/local law enforcement routinely work together and share information when investigating criminal activity. Using a common sense approach, if a local agency has employed a certain investigative technique in a particular case, federal agencies can rely on the ineffectiveness of that technique for purposes of showing necessity in the federal investigation of the same case.

considered using a number of alternative techniques over the course of its 18-month investigation.

**[5]** In light of the representations made in the Government's affidavit, the issuing court had a sufficient basis to find that the wiretap order was essential to the success of the conspiracy investigation. Accordingly, we conclude that the issuing court did not abuse its discretion in finding that the wiretap was necessary to identify the full scope of the Reed organization and "develop an effective case" against its members. *See Rivera*, 527 F.3d at 902 (citing *Decoud*, 456 F.3d at 1007).

Williams and Johnson also challenge the affidavit supporting the application for the wiretap on Target Telephone 11 ("TT11"), on the basis that the affidavit for TT11 was based on the same showing of necessity as was used for TT10 and that some of the evidence derived from the wiretap of TT10 was used to support the TT11 application. Because we affirm the district court's finding of necessity as to TT10, we reject these challenges to the affidavit for TT11.

## B. The Government Was Not Required to Terminate the Wiretap of TT10 after Learning That Terry Jackson Was the Primary User.

Appellants argue that, once authorities discovered that TT10's primary user was Terry Jackson, they should have immediately discontinued the wiretap. They contend that to continue listening to Jackson's phone calls was akin to getting a search warrant for one house, searching the wrong house, and then even after discovering that it is the wrong house, continuing the search anyway. We disagree with this analogy in light of the language of § 2518.

Authorization for a wiretap is based on probable cause to believe that the *telephone* is being used to facilitate the commission of a crime, and the order need not name any particu-

lar person if such person is unknown. *See* § 2518(1)(b)(iv)); *Kahn*, 415 U.S. at 157; *United States v. Nunez*, 877 F.2d 1470, 1473 n.1 (10th Cir. 1989) ("[T]he government ha[s] no duty to establish probable cause as to each interceptee. It is sufficient that there was probable cause to tap the phone.").

**[6]** We have previously stated that wiretap authority is tied "to specific communications facilities or locations," and "[a] cellular phone number is a 'communications facility.' " *Hermanek*, 289 F.3d at 1086 & n.3. Identification of individuals whose communications will be intercepted is only required "if known." § 2518(4)(a). Interpreting this provision, the Supreme Court said, "Congress could not have intended that the authority to intercept must be limited to those conversations between a party named in the order and others, since at least in some cases, the order might not name any specific party at all." *Kahn*, 415 U.S. at 157.

**[7]** The Government concedes that, after four hours of monitoring TT10, it was clear that Jackson was the primary user. Nonetheless, the record shows that TT10 was being used in the furtherance of Reed's PCP enterprise, that Jackson (a previously unknown associate of Reed) called and received calls from Reed regarding PCP manufacturing, and, on at least one occasion, Jackson answered a call on TT10 for Reed and handed the phone to Reed who then proceeded with the conversation. The Government did not get an order for the wrong phone, nor intercept calls on a phone for which they had no order. Although the primary, known target was Reed, the objective of the wiretap was to intercept communications made over TT10 to identify the co-conspirators in the PCP manufacturing conspiracy. In the application, the Government identified Jackson as the subscriber of TT10. The Government subsequently notified the issuing court that Jackson was the primary user, that he was involved in conversations regarding the PCP conspiracy, and that Reed continued to call and receive calls from TT10 regarding PCP manufacturing. Neither the order nor the wiretap statute requires suppression

of legally intercepted conversations merely because Reed was not the primary user of TT10.

Appellants make the additional argument that, to intercept calls on TT10, the Government must have made a separate showing of necessity as to Jackson once it learned that TT10 was primarily used by Jackson. In other words, the Government had not exhausted traditional investigative techniques with regard to Jackson, did not show necessity with regard to Jackson, and therefore the wiretap and all derivative evidence should be suppressed. We reject this argument, given the circumstances of this case.

[8] First, "the government may seek a wiretap authorization in order to discover the identities of suspected co-conspirators, and a conversation involving a party not named in the authorization that reveals that party's involvement in the criminal activity under investigation is admissible." *See United States v. Homick*, 964 F.2d 899, 904 (9th Cir. 1992) (citing *Kahn*, 415 U.S. at 156-57). The wiretap application for TT10, on its face, names certain subjects, in particular Reed, and "others unknown." The Government acknowledged that TT10 was subscribed to by Jackson, and that TT10 was being used by Reed and others, to advance their conspiracy to manufacture and distribute PCP. Reed was clearly using TT10 in the furtherance of that conspiracy, which Appellants have not disputed. At the time of the wiretap application, the Government knew only that Terry Jackson was the subscriber of TT10, but Jackson was not a known conspirator.

Second, the necessity requirement is directed to the objective of the investigation as a whole, and not to any particular person. If the Government can demonstrate that ordinary investigative techniques would not disclose information covering the scope of the drug trafficking enterprise under investigation, then it has established necessity for the wiretap. *See McGuire,* 307 F.3d at 1197-99. As with probable cause, "the government ha[s] no duty to establish [necessity] as to each

possible interceptee. It is sufficient that there was [necessity] to tap the phone." *Cf. Nunez*, 877 F.2d at 1473 n.1 (citations omitted). As discussed above, we conclude that the Government sufficiently established necessity for the wiretap with regard to its investigation of the drug trafficking conspiracy as a whole.

### C. The District Court Did Not Err in Finding That the Government Had Not Illegally Intercepted Telephone Calls.

Appellants argue that (1) the Government illegally intercepted calls from another of Reed's cellular telephones, "the 619 number," without a court order, (2) transferred the illegally intercepted calls to the wireroom for TT10 to make the call appear to be legally intercepted, and (3) then colluded with the telephone company to conceal the illegal act. The district court found that no such illegal wiretap occurred. Reviewing the record, we conclude that the district court's findings are not clearly erroneous. *See Hermanek*, 289 F.3d at 1085 (factual findings reviewed for clear error).

First, the Government presented evidence in the form of declarations from the agent in charge of the investigation and an employee of the telephone company, stating that no wiretap was conducted on the 619 number. Second, the record shows that nearly every one of the suspect calls from the 619 number involved Reed speaking with Jackson. Jackson was the listed subscriber and primary user of TT10, for which the Government had a lawful wiretap order. Therefore, the direct evidence in the record supports the conclusion that the Government intercepted calls on TT10 between Reed (using the 619 number) and Jackson (using TT10).

Appellants' theory is based on "circumstantial evidence," including discrepancies between wiretap investigation records and billing records provided by the telephone company, as well as the suggestion that the 619 number was previously

subscribed to the Long Beach Police Department.[5] Appellants point to Government wiretap records that do not precisely match billing records provided by the telephone company. A defense expert testified that, because the CDC was not provided by the Government, he could not do a complete analysis of the wiretap. He nonetheless opined that, because some of the dial tones heard in the recordings did not sound like cellular telephone calls, the Government may have been wiretapping other telephones.

The Government's wiretap records also showed Reed calling TT10 more than twenty-seven times from the 619 number, but telephone billing records for TT10 do not show all of these calls. Appellants argue that this proves that the intercepted calls were not done from the authorized wiretap of TT10, but from an unauthorized and illegal wiretap of the 619 number. Appellants further speculate that the Government colluded with the telephone company to cover up the illegal wiretap. When Reed subpoenaed the records for the 619 telephone, the records for the period when Reed called TT10

---

[5]Appellants speculate that the Government must have changed the subscriber information (to a fictitious account) on the 619 number and planted it with Reed to facilitate their illegal monitoring. In support of this theory, Appellants relied on the opinion of a former DEA agent who testified that, based on his investigation of the 619 number, he believed that it had previously been subscribed to the Long Beach Police Department. Billing records for the 619 number showed that it was subscribed to Aric Kadosh, a fictitious account, and had once belonged to the City of Long Beach. When the cell phone was used by the City of Long Beach, multiple calls were made to Long Beach police officers, and therefore Appellants assert that the 619 telephone must have belonged to the Long Beach police department. Because the FBI and Government task force investigating Reed once interviewed a cooperating witness in Long Beach, "possibly at the Long Beach Police Department," Appellants speculate that the Government provided a cellular phone (the 619 number) to the witness to give to Reed. The Government challenges this theory by pointing out that the 619 telephone was one of five numbers used by Reed, all of which were subscribed to by the same fictitious account, and all of which were shut down shortly after seizure of the van containing PCP.

using the 619 telephone turned up missing. Therefore, Appellants argue that the Government must have been monitoring the 619 number without a court order.

To explain the discrepancies between the phone records and telephone company records, a DEA technician testified that the DEA equipment could not capture all of the electronic data sent by the telephone company. A telephone company employee also testified that billing records do not reflect incomplete or dropped calls, and "even when calls are completed, and communication takes place, technical failures may cause some calls not to be reflected in billing records." The telephone company employee also testified that billing records may contain inaccuracies, because they are maintained by an outside billing service, and it is not unusual for the billing statement to show fewer calls than the pen register and wiretap data.

**[9]** We find Appellants' theory to be highly speculative and supported only by tenuous, circumstantial evidence.[6] The district court's conclusion that there was no illegal wiretapping of the 619 number is supported by the record. Therefore, we cannot say that the district court's findings are clearly erroneous, or that the district court erred in denying the motion to suppress based on the allegation of a warrantless wiretap of the 619 number.

### D.  The Government Properly and Timely Sealed the Wiretap Recordings.

**[10]** We reject Appellants' argument that there was undue delay in sealing the wiretap recordings for TT10 and other lines. Section 2518(8)(a) requires that "[i]mmediately upon

---

[6]Further, we note that the defense expert's opinion that some of the calls did not sound like cellular phones does not support Appellants' theory that the Government illegally intercepted calls on the 619 number, where the 619 number was a cellular telephone.

the expiration of the period of [a wiretap] order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." § 2518(8)(a). We have previously borrowed the interpretation of other circuits that "immediately sealing recordings" means "within one or two days" and "any delay beyond that certainly calls for explanation." *United States v. Pedroni*, 958 F.2d 262, 265 (9th Cir. 1992) (citations omitted). The length of a delay is not dispositive, but the Government must "explain not only why a delay occurred but also why it is excusable." *Id.* at 265-66 (admitting recordings after 14 day delay and citing cases admitting recordings after delays of 20, 39, 57 and 118 days) (citation and quotation marks omitted). Further, "[t]he unavailability of the issuing or supervising judge may constitute a satisfactory explanation for a sealing delay." *Id.* at 266. We review de novo the district court's determination that the Government's reasons for delay in sealing the wiretap recordings were satisfactory. *Id.* at 265 (citation omitted).

[11] In this case, Appellants cry foul over a six day delay in sealing the wiretap recordings for TT10.[7] The district court concluded that the Government had complied with § 2518(8)(a), because that section requires that "immediately upon expiration" of the wiretap order, "the recordings shall be *made available* to the judge issuing such order." (emphasis added). The record shows that the Government made its applications to seal the recordings within one or two court days after the wiretaps terminated, and then sought the first available date provided by the district court for sealing.[8] Thus, the

---

[7]Appellants also challenge the four-day delay in sealing TT11, and a seven-day delay in sealing Target Telephone 8 ("TT8").

[8]The record shows that for TT8, the wiretap terminated on Friday, March 28, 2003 at 9:00 pm, and the application to seal the recordings made the following Tuesday on April 1, 2003, with the court issuing the order to seal on April 4, 2003. For TT10, the wiretap terminated on Friday, May 2, 2003, the application filed on the following Monday, and the seal ordered on May 8, 2003. Finally, for TT11, the wiretap terminated on Thursday, May 29, 2003, with the application to seal made the same day, and granted the following Monday, June 2, 2003. We conclude that none of these delays is so extreme, nor the explanation insufficient, to require suppression.

Government made the recordings immediately available to the district court. Although the actual sealing of the recordings was not always accomplished within two days, the record shows that any delay was the result of the district judge's unavailability due to a full calendar. We conclude that this explanation is satisfactory for the short delays involved in this case. *See Pedroni*, 958 F.2d at 265. Therefore, the district court correctly denied the motion to suppress on this basis.

### E. Section 2518(8)(a) Does Not Require the Government to Seal CDC.

**[12]** Appellants also argue that the wiretap evidence should be suppressed, because the Government failed to seal CDC from TT10. The district court ruled that § 2518(8) does not apply to CDC, because it is not an "oral or wire communication." Whether § 2518(8) requires the sealing of CDC is a question of first impression for this court. We review de novo the district court's construction or interpretation of a statute. *United States v. Cabaccang*, 332 F.3d 622, 624-25 (9th Cir. 2003) (en banc). We affirm, holding that CDC is not an intercepted communication falling within the sealing requirements of § 2518(8).

We first emphasize that CDC is separate and distinct from the substantive, oral content of a telephone call. In this case, the record shows that the wiretap order for TT10, which also authorized the use of a pen register and trap and trace device, directed the telephone company to provide the Government with both the oral call content ("CCC") and CDC. CCC encompasses only the oral conversations that are transmitted over the telephone line, while CDC is data about the "call origination, length, and time of call." In other words, CDC encompasses the information collected by the pen register and/or trap and trace device. Because CDC is nothing more than pen register and trap and trace data, there is no Fourth Amendment "expectation of privacy." *See Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). Further, pen registers and trap

and trace devices and data are regulated by 18 U.S.C. §§ 3121-3127, which contain no requirement that such data be sealed.

Appellants argue that, because CDC was part of the data stream collected in real time by the Government in connection with the wiretap, it falls within the provisions of § 2518(8) and failure to seal the CDC data requires suppression. We disagree.

To determine whether § 2518(8)(a) requires CDC data to be sealed, we begin with the plain language of the wiretap statute. *See United States v. Rosales,* 516 F.3d 749, 758 (9th Cir. 2008) ("Statutory interpretation begins with the plain language of the statute.") (citation and alteration omitted). The statute provides, in relevant part:

> The contents of any wire, oral, or electronic communication intercepted . . . shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as will protect the recording from editing or other alterations. Immediately upon the expiration of the period of the order, . . . such recordings shall be made available to the judge issuing such order and sealed under his directions.

§ 2518(8).

**[13]** The plain language of this recordation and sealing requirement applies only to the "*contents* of any wire, oral, or electronic *communication intercepted . . .*" § 2518(8) (emphasis added). As defined in 18 U.S.C. §§ 2510(1)-(2), a wire or oral communication is an "aural communication" made by aid of a wire, or an "oral communication" uttered by a person. 18 U.S.C. §§ 2510(1)-(2).[9] CDC clearly does not fall within this

---

[9]Section 2510 defines "wire communication" as "any aural transfer made in whole or in part through the use of facilities for the transmission

definition, because it is not an aural communication of any kind.

**[14]** Appellant Johnson argues that CDC must be sealed, however, because it is an "electronic communication," which is defined as:

> any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . .

18 U.S.C. § 2510(12). Even if CDC data could be considered an "electronic communication," the failure to seal the data would not require suppression. Suppression for violation of the statute is permitted only for "wire or oral communications." Section 2518(10)(a) provides:

> Any aggrieved person . . . may move to suppress the contents of *any wire or oral communication* intercepted . . . or evidence derived therefrom, on the grounds that—
>
> (i) the communication was unlawfully intercepted;
>
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

---

of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception . . ." 18 U.S.C. § 2510(1).

An " 'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication[.]" *Id.* at § 2510(2).

(iii) the interception was not made in conformity with the order of authorization or approval.

§ 2518(10)(a) (emphasis added). As discussed above, CDC is clearly not a "wire or oral communication" and therefore suppression is not permitted by the statute. The statute further states that "[t]he remedies and sanctions described in this chapter with respect to the interception of electronic communications are the only judicial remedies and sanctions for non-constitutional violations of this chapter involving such communications." § 2518(10)(c). Because sealing is not a constitutional requirement, there is no statutory remedy of suppression for interceptions of "electronic communications." *See United States v. Meriwether*, 917 F.2d 955, 960 (6th Cir. 1990) (citing § 2518(10)(c)). Accordingly, even if we accepted Johnson's argument that the CDC data stream was an electronic communication, the district court did not err in denying the motion to suppress for failure to seal the CDC data. Nonetheless, as discussed below, we conclude that CDC is not an electronic communication that must be sealed under § 2518(8).

CDC is undoubtedly data, and in this case the data was compiled in real time by the telephone company and transferred to the federal agents monitoring the wiretap via wire. Therefore, in the abstract, CDC appears to satisfy the definition of an electronic communication. However, to determine whether CDC is subject to the sealing requirement, we must construe this provision in the context of the legislative scheme regulating wiretaps. *See United States v. Atlantic Research Corp.*, 551 U.S. 128, 127 S. Ct. 2331, 2336 (2007) ("Statutes must 'be read as a whole.' ").

The wiretap statute generally protects *the parties to a communication* against the unlawful *interception*, use, and disclosure of that *communication* by persons who are not parties to the communication. *See* 18 U.S.C. §§ 2511 & 2512. For example, only an "aggrieved person" may move to suppress

the contents of an unlawfully intercepted communication. § 2518(10). An "aggrieved person" is defined to be any "person who *was a party* to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11) (emphasis added). Applications for an order authorizing a wiretap also focus on the *interception*[10] of communications made by individuals in the commission of a criminal act. *See* § 2518(1). Further, the sealing requirement applies only to the "contents" of an intercepted communication that can be recorded. § 2518(8).[11]

From these provisions, it becomes clear that the sealing and recordation requirements of § 2518(8) apply only to (1) the contents of (2) a wire, oral, or electronic communication (3) that is transmitted between the parties to that communication (4) and intercepted by the Government, and then (5) only when the contents of the communication are able to be recorded.

**[15]** The record shows that CDC data is not transmitted to or received by the parties to a telephone call. Rather, it is data that is incidental to the use of a communication device and contains no "content" or information that the parties intended to communicate. It is data collected by the telephone company about the source, destination, duration, and time of a call. In other words, CDC is not a communication under § 2518, because it is not communicated to or from the parties to the telephone call.

---

[10]Within the context of the wiretap statute, an "intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

[11]As defined in the wiretap statute, " 'contents' when used with respect to any wire, oral, or electronic communication, includes any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

**[16]** To the extent that CDC is a communication of any sort, it becomes such only when the telephone company transmits it to law enforcement. In that context, it is a communication of telephone company records from the telephone company to law enforcement, and therefore not intercepted.[12] Even though law enforcement may receive CDC by way of a transfer of data over a wire, CDC is not an intercepted "electronic communication" subject to the sealing requirements.

To the extent that the CDC data in this case might be viewed as "intercepted," because it was received by law enforcement in real time in conjunction with their intercept of telephone calls on TT10, CDC still need not be sealed. The CDC contains no "content" from the intercepted telephone calls. Only the "content" of the communication need be sealed, § 2518(8), and CDC (unlike CCC) contains no "information concerning the substance, purport, or meaning of [the] communication." *See* § 2510(8) (defining "contents").

**[17]** Because CDC is not an intercepted communication of any sort and does not contain the content of an intercepted wire, oral or electronic communication, we hold that it is not subject to the recordation and sealing requirements of § 2518(8).[13] We also note that suppression in this case would

---

[12]Our conclusion is also supported by the legislative history of the wiretap statute. The 1968 Senate Report expressly provides, "An examination of telephone company records by law enforcement agents in the regular course of their duties would be lawful because it would not be an 'interception.' The proposed legislation is intended to protect the privacy of the communication itself and not the means of communication." S. Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.C.C.A.N. at 2178 (citing *United States v. Russo*, 250 F. Supp. 55 (E.D. Pa. 1966)).

[13]Although we hold that law enforcement need not seal CDC data, nothing in our opinion should be construed as relieving the Government of its responsibility to preserve, produce, disclose, and/or present for inspection any evidence within its care and custody. *See, e.g.*, Fed. R. Crim. P. 16 (prescribing the government's discovery and disclosure obligations); *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (government must disclose favorable evidence that is material either to guilt or to punishment).

not be warranted, because the Government acted in good faith. *See United States v. Butz*, 982 F.2d 1378, 1383 (9th Cir. 1993) (wiretap evidence should not be suppressed where officers relied in good faith on then-existing law in obtaining pen registers). Here, the district court found that the Government relied in good faith on its interpretation of the law in not sealing CDC data. This finding is not clearly erroneous.

**F.  The District Court Did Not Err in Finding That the Wiretap Was Supervised by Authorized Federal Agents.**

We also reject Appellants' argument that the district court should have suppressed the wiretap evidence, because (1) a sign-in sheet in the wiretap room was not properly maintained and (2) at least one federal agent entered the wiretap room without having signed a memorandum prepared by the supervising Assistant U.S. Attorney.

Section 2518(5) requires that a wiretap must be conducted under the supervision of an authorized law enforcement officer. It provides, in relevant part:

> An interception . . . may be conducted in whole or in part by Government personnel, or by an individual

---

Further, while the government does not have "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution," *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988), the government must always act in good faith to preserve relevant and material evidence, particularly if that evidence has apparent exculpatory value and where a defendant "would be unable to obtain comparable evidence by other reasonably available means," *California v. Trombetta*, 467 U.S. 479, 489 (1984); *see also United States v. Artero*, 121 F.3d 1256, 1259-60 (9th Cir. 1997).

In this case, the district court found that the Government acted in good faith and provided Appellants with all CDC data that the Government was able to collect. These findings are not clearly erroneous.

operating under a contract with the Government, acting under the supervision of an investigative or law enforcement officer authorized to conduct the interception.

§ 2518(5).

Appellants argue that, because sign-in sheets and work schedules were not available to corroborate that contract personnel were properly monitored, the Government failed to comply with § 2518(5). Further, Appellants argue that one federal agent, Michelle Starkey, was present on several occasions in the monitoring room, but was not authorized to be present, because she had not signed a memorandum (outlining wiretap procedures) prepared by the supervising Assistant U.S. Attorney. These arguments are not persuasive.

[18] Section 2518(5) does not require the government to follow any specific protocol to properly supervise a wiretap. The Government presented evidence that "[a]t all times while wiretap interception was being conducted, contract personnel were being supervised by one or more government personnel." Agent Starkey's mere presence, even if not authorized by internal procedures, does not violate the requirements of § 2518(5), because authorized agents supervised her.[14] As the district court noted, an isolated failure to follow internal procedures does not amount to a failure to abide by the requirements of the statute. Therefore, we affirm the district court's findings that the wiretap was properly supervised in compliance with the statute.

---

[14]Even if an isolated violation of agency policy amounted to a violation of the statute, it is not clear that Agent Starkey's presence caused any substantive failures to properly monitor the wiretap. Likewise, Appellants have not shown any non-speculative prejudice resulting from Agent Starkey's presence.

## II. THE DISTRICT COURT DID NOT ERR IN EXCLUDING EXPERT TESTIMONY ON THE LEGALITY OF WIRETAP EVIDENCE AT A PRE-TRIAL ADMISSIBILITY HEARING AND AT TRIAL.

Reed argues that Appellants' due process rights were violated when the district court (1) refused to authorize funds for the presence of an expert at a pretrial hearing on the authenticity of the wiretap recordings and (2) excluded testimony from the same expert at trial. We review the district court's decision to authorize funds for an expert witness for abuse of discretion. *United States v. Depew*, 210 F.3d 1061, 1065 (9th Cir. 2000). We also review the decision to admit or deny expert testimony for abuse of discretion. *See United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000).

### A. Denial of Expert Testimony at Admissibility Hearing.

[19] We conclude that the district court did not abuse its discretion and Appellants were not prejudiced by the district court's denial of Appellants' request to have an expert present at the hearing regarding the admissibility of the wiretap recordings. Under 18 U.S.C. § 3006A(e)(1), the district court must authorize employment of an expert witness for an indigent defendant if it finds that an expert is necessary. Whether funds should be expended for an expert depends on "the context of the underlying claim for which [one] asserts he ought to have been given expert help." *United States v. Rodriquez-Lara*, 421 F.3d 932, 940 (9th Cir. 2005). Thus, Appellants must show by clear and convincing evidence that "(1) a reasonably competent counsel would have required the assistance of the requested expert for a paying client, and (2) he was prejudiced by the lack of expert assistance." *Depew*, 210 F.3d at 1065 (citations and internal quotation marks omitted).

In this case, the record confirms that the district court authorized funds to retain an expert and Reed had the benefit

of the expert's assistance. Reed argues that the district court erred in denying funds to allow the expert to travel to and be present at a hearing regarding the admissibility of the wiretap recordings. The district court reasoned that the hearing was to lay the foundation for the wiretap calls by the percipient witness, and no expert testimony would be necessary. Consequently, the expert was not present and did not testify at the admissibility hearing.

We conclude that the district court did not err in refusing to allow the expert to be present at the admissibility hearing. Given the defense theory (that the wiretap recordings included recordings from illegal wiretaps), the testimony was relevant to the issue of suppression. The record shows that the district court heard the defense expert's testimony at the suppression hearing. Therefore, the district court did not abuse its discretion in refusing to hear the same testimony at the admissibility hearing.

To the extent that Reed contends that he required the assistance of the expert to prepare for cross-examination of the Government's foundation witnesses, Reed cannot show prejudice. Given Reed's theory in this case, a reasonable, competent counsel may have needed expert assistance to prepare for cross-examination. However, the record shows that Reed's attorney actually consulted with the expert during a two-week recess to develop the cross-examination of the Government's foundation witness. When the hearing was reconvened, Reed's counsel informed the court that it had "spent many hours with the expert . . . developing a line of cross-examination." Therefore, we conclude that Reed had the benefit of expert assistance in preparing for the hearing.

Reed cannot show that he was prejudiced by not having his expert present at this hearing. First, as noted above, Reed consulted with his expert in preparing for cross-examination of the Government's witness. But in any event, Reed's counsel declined to cross-examine the Government's witness at the

hearing. Given the record, Reed has failed to show any prejudice.

## B. Denial of Expert Testimony on Illegal Wiretaps at Trial.

[20] The district court also did not abuse its discretion in precluding expert testimony at trial in support of Appellants' theory that the Government used "illegal wiretaps." Arguing that the expert testimony went to the credibility of the Government witnesses, Appellants sought to present the same evidence adduced at the hearings on the renewed motion to suppress: expert opinion that there were "anomalies" in the wiretap that could indicate that the Government was conducting illegal wiretaps. The district court ruled that the issue of the legality of the wiretap was a matter for the court and not the jury. We agree.

It is well-settled that "the question of the competency of the evidence . . . by reason of the legality or otherwise of its seizure [is] a question of fact and law for the court and not for the jury." *Steele v. United States*, 267 U.S. 505, 511 (1925) (citing *Gila Valley, G. & N. Ry. Co. v. Hall*, 232 U.S. 94, 103 (1914) ("Questions of the admissibility of evidence are for the determination of the court; and this is so whether its admission depend upon matter of law or upon matter of fact.")). The legality of a wiretap and the question of whether the Government had a warrant for a wiretap is not a question for the jury to consider, because it is not immediately relevant to the question of guilt. *See Jones v. United States*, 362 U.S. 257, 264 (1960) (noting requirement that motion to suppress "be made before trial . . . is designed to eliminate from the trial disputes over police conduct not immediately relevant to the question of guilt"), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 85 (1980). Rather, it is a question for the court in the context of a pretrial motion to suppress, Fed. R. Crim. P. 12(b)(3)(C), wherein the court must determine the competence of evidence and whether such evidence, if ille-

gally obtained, must be suppressed. *See also* 23A C.J.S. Crim. L. § 1748 ("Where the admissibility of the evidence depends on the legality of its seizure or other manner of procurement, the question whether it was legally obtained is ordinarily for the court.").

Appellants' sole purpose in seeking to introduce the expert testimony at trial was to reargue the issue of illegal wiretaps, which the district court had previously addressed in the pretrial motion to suppress. The district court considered whether the expert testimony might be introduced for other purposes at trial, such as attacking the foundation and authenticity of the wiretap recordings. Yet, Appellants did not challenge the content of the wiretap recordings, and they do not now contend that the content of the recordings has been altered. Rather, the record confirms that the sole purpose of the proffered expert testimony was to show that the Government obtained evidence illegally. The legality of the wiretap was a question exclusively for the district court to answer. Accordingly, the court did not abuse its discretion in refusing to relitigate the issue by presenting it to the jury.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING DEFENDANTS' MOTION TO DISMISS THE INDICTMENT OR EXCLUDE TESTIMONY.

Appellants challenge the district court's denial of their motion to dismiss the indictment or to preclude the testimony of Agent Starkey and strike the testimony of several cooperators, alleging that Agent Starkey destroyed her rough interview notes in a violation of the Jencks Act, 18 U.S.C. § 3500, and the Confrontation Clause of the Sixth Amendment. We review the district court's rulings on alleged violations of the Jencks Act for abuse of discretion. *United States v. Simtob*, 901 F.2d 799, 808 (9th Cir. 1990) (citation omitted). We review the district court's evidentiary rulings during trial for abuse of discretion. *See United States v. Alvarez*, 358 F.3d

1194, 1205 (9th Cir. 2004) (noting "wide discretion") (citation omitted). We conclude that the district court did not err, because Agent Starkey's rough interview notes were not a "statement" within the meaning of the Jencks Act, and Appellants have shown no prejudice resulting from the destruction of the notes.

## A. Agent Starkey's Notes Were not a Statement under the Jencks Act.

After a witness testifies for the government, the Jencks Act requires the court to order the production, on motion by a defendant, of any witness statements that the government possesses "which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). Under the Act, a "statement" is "a written statement made by said witness and signed or otherwise adopted or approved by him," or a "substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement." *Id.* at § 3500(e). Notes and reports of government agents who testify for the government may constitute "a written statement made by said witness and signed or otherwise adopted or approved by him." *United States v. Johnson*, 521 F.2d 1318, 1319 (9th Cir. 1975) (quoting 18 U.S.C. § 3500(e)(1)).

We have previously held that "the imposition of sanctions [for an alleged Jencks Act violation] is not justified where the rough interview notes of an agent are destroyed in good faith and those notes can be determined by secondary evidence not to be Jencks Act 'statements.' " *United States v. Griffin*, 659 F.2d 932, 938 n.5 (9th Cir. 1982). "While a defendant need not prove prejudice to show a violation of the Jencks Act, when there is no prejudice, a witness's testimony need not be stricken." *United States v. Riley*, 189 F.3d 802, 806 (9th Cir. 1999) (internal citations omitted).

We have also stated that:

> [I]t will be the very unusual case where an agent's own thoughts will be recorded in rough interview notes with sufficient completeness or intent to communicate to be a Jencks Act statement. In the more typical case, only the formal interview report, through which the agent intends to communicate to others, will be a "statement" under the Jencks Act.

*Griffin*, 659 F.2d at 938 n.4.

**[21]** During trial, Appellants learned that Agent Starkey had taken handwritten notes of interviews, converted them into a typed report, and then destroyed the original notes. The next day, Appellants moved to dismiss the indictment based upon a Jencks Act and Sixth Amendment violation. Agent Starkey testified that the formal reports she prepared contained all information from her rough notes, and that destruction of notes was not done under any formal policy of her agency. The district court denied Appellants' motion, finding that the notes were "an aide for her memory," that everything from the notes was reflected in the interview reports, and further, that her destruction of the notes was not done in bad faith. These findings are not clearly erroneous.

Further, we find nothing in the record to suggest that the notes were a "statement" within the meaning of the Jencks Act, because they were not adopted or approved by any of the witnesses and were not described to be verbatim transcriptions of the witnesses' words. Further, the formal reports prepared by Agent Starkey (and which were given to Appellants at trial) included all the important facts from her notes, including any potentially exculpatory facts. *See United States v. Williams*, 291 F.3d 1180, 1191 (9th Cir. 2002) (production of notes not required when the substance of the notes has been preserved in a formal memorandum), *overruled on other grounds by United States v. Gonzales*, 506 F.3d 940 (9th Cir. 2007).

### B. Appellants were Able to Effectively Cross-Examine the Cooperating Witnesses.

Appellants also challenge their conviction on the basis that the destruction of Agent Starkey's notes was a violation of the Sixth Amendment Confrontation Clause. They argue that without Agent Starkey's rough interview notes, they were unable to effectively cross-examine the Government's cooperating witnesses. They contend that the district court erred in not dismissing the indictment or striking the testimonies of the cooperating witnesses.[15] We disagree.

The Confrontation Clause "requires that a defendant be given an opportunity for effective cross-examination." *Murdoch v. Castro*, 365 F.3d 699, 704 (9th Cir. 2004) (citation omitted). However, it "does not guarantee that a defendant has all material that he seeks to impeach a witness. Rather, it guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " *Williams*, 291 F.3d at 1191 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)).

In *Williams*, we affirmed the admission of statements even though the government failed to produce rough interview notes. *Id.* The court rejected a Confrontation Clause challenge because (1) the defendant "had a meaningful opportunity to cross-examine [the witness], even without the notes," and (2) had not shown prejudice. *Id.*

**[22]** Here, Appellants were able to cross-examine all the witnesses. They have made no showing that the notes (1) con-

---

[15]"A district court may dismiss an indictment on any of three grounds: (1) due process, (2) inherent supervisory powers (protecting the integrity of the judicial process), and (3) statutory grounds." *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988). Dismissal is a drastic step that is disfavored. *Id.*

tained anything exculpatory or (2) would have affected the outcome of the trial. Thus, they have not shown any prejudice due to the destruction of the rough notes, especially where Appellants received Agent Starkey's formal reports, which the record indicates contained all the information in the rough notes. Therefore, we conclude that the district court was not required to dismiss the indictment or strike any testimony, and thus did not abuse its discretion.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ALLOWING EXPERT TESTIMONY REGARDING DRUG JARGON.

Appellant Johnson challenges the district court's ruling on his objection to Detective Labbe's testimony about the meaning of coded language used in the wiretap recordings. At trial, Johnson argued that Labbe was not qualified and that his testimony was unreliable, in violation of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). We review the district court's decision to admit expert testimony for abuse of discretion. *United States v. Calderon-Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008).

Rule 702 of the Federal Rules of Evidence allows for expert, opinion testimony by a "witness qualified as an expert by knowledge, skill, experience, training or education" where the testimony will "assist the trier of fact to understand" matters of "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. "Drug jargon" is a proper subject for expert testimony. *United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007). The Advisory Committee Notes to Rule 702, expressly authorize the use of testimony by law enforcement officers concerning the meaning of words used by drug traffickers.

We have previously held that law enforcement testimony about the meaning of drug jargon may be both expert and lay testimony, depending on the circumstances. *Freeman*, 498

F.3d at 901-05. Coded terms are the subject of expert testimony, when based on the witness's experience in investigating narcotics offenses. *Id.* The meaning of other, ambiguous terms is the proper subject of lay testimony, when based on the witness's knowledge of the particular case and the defendants. *Id.*[16]

[23] Here, Johnson argues that Labbe did not demonstrate the knowledge, skill, experience, training, or education sufficient to qualify him as an expert or as a percipient witness regarding drug jargon or coded language in the PCP drug trade. The district court exercised discretion, sustaining objections to a portion of Labbe's testimony regarding the meaning of "speakers," but permitting testimony relating to "grignard," "yardstick," and "yards," which Labbe testified he knew to refer to the reagent used in the PCP manufacturing process. Reviewing the record, we are satisfied that Labbe's testimony was based on his experience investigating PCP traffickers and on his specific experience investigating the present case. His testimony was not inherently unreliable and it was helpful in defining ambiguous terms used in the wiretap recordings. The terms related to PCP manufacturing and were outside the knowledge of the lay juror. Therefore, the district court did not abuse its discretion in permitting Detective Labbe's testimony.[17]

---

[16]Appellants raised no objection at trial to Labbe's dual roles as both an expert and lay witness. We conclude that allowing Labbe to testify as both an expert and lay witness was not plain error. *Freeman*, 498 F.3d at 904. Given the specific nature of Labbe's testimony and the fact that Appellants were able to conduct a full cross-examination, we conclude that there is little risk of prejudicial juror confusion. In any event, viewing any error "in the context of the entirety of [Labbe's] testimony and other evidence offered by the [G]overnment," we conclude that any error was harmless. *See id.* at 905.

[17]We review for plain error the admission of the portions of Labbe's testimony that were admitted without objection. *United States v. McIver*, 186 F.3d 1119, 1129 (9th Cir. 1999)). For example, Detective Labbe testified (without objection) that "bounce spot" and "bomb spot" referred to loca-

## V. SUFFICIENT EVIDENCE SUPPORTS THE JURY'S GUILTY VERDICT AGAINST WILLIAMS.

Appellant Williams also appeals the district court's denial of his Rule 29 motion, challenging the sufficiency of evidence on the guilty verdict as to the drug conspiracy count and on the special verdict as to the quantity of drugs. We review de novo the district court's denial of a Rule 29 motion for judgment of acquittal. *United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2004). The question we must address is whether, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001) (emphasis in original and citations and internal quotations omitted). We conclude that there is sufficient evidence to support Williams' conviction.

### A. There is Sufficient Evidence Supporting a Guilty Verdict as to Conspiracy.

"To establish a drug conspiracy, the government must prove (1) an agreement to accomplish an illegal objective; and (2) the intent to commit the underlying offense." *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 2007) (citation omitted), *amended by* 127 F.3d 1200 (9th Cir. 1997). Williams argues that the evidence showed only his "mere presence" by his "association" with three co-conspirators and participation in three telephone calls, but not any agreement to any unlawful objects of the conspiracy. Williams also

---

tions to manufacture PCP, that "bird up there" referred to police surveillance helicopters, and that "pipes" referred to a PCP precursor chemical, piperidine. Admission of Labbes' testimony on these words was not plain error where the testimony was based on his experience in PCP investigations, particularly where Defendants had the opportunity to rebut and cross-examine.

argues that evidence that he received PCP from Reed only shows that he was a purchaser of drugs, which does not render him a member of a conspiracy to distribute drugs. *See United States v. Mancari*, 875 F.2d 103, 105 (9th Cir. 1989) ("A sale for the buyer's personal consumption, as distinct from a sale for resale, does not a conspiracy make.").

Relevant to Williams argument, we have previously stated:

> In a "mere presence" . . . case, the question is whether there is enough evidence to tie the defendant to the criminal activities. . . . [O]nce a conspiracy is established[,] only a slight connection to the conspiracy is necessary to support a conviction. . . The term "slight connection" means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details. A connection to the conspiracy may be inferred from circumstantial evidence.

*Herrera-Gonzalez*, 263 F.3d at 1095. "Innocent association, even if it is knowing, does not amount to a 'slight connection.' " *Id.*

"Because most conspiracies are clandestine in nature, the prosecution is seldom able to present direct evidence of the agreement." *Iriarte-Ortega*, 113 F.3d at 1024 (quoting 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 6.4(d) 71 (1986)). Thus, a jury may infer the existence of an agreement from circumstantial evidence, such as the defendant's conduct. *Id.* "Coordination between conspirators is strong circumstantial proof of agreement . . . ." *Id.*

**[24]** Our review of the record shows sufficient evidence that Williams was engaged in a conspiracy to distribute PCP. For example, Stinson testified that Williams was involved in various conversations about PCP sales, including an inter-

cepted call where Williams states that he has out-of-state customers ready to buy PCP when Reed had completed manufacturing it. Stinson also testified that he and Reed delivered PCP to Williams for distribution. Stinson also recalled that Reed gave Williams a gallon of PCP. Detective Labbe also testified about an intercepted conversation between Williams and Reed discussing Reed's plans to continue manufacturing PCP following a lab seizure, in which Williams counseled Reed to stay away from the Los Angeles docks to avoid law enforcement.

The evidence, adduced at trial and recounted during the hearing on the Rule 29 motion, is sufficient to allow a rational trier of fact to find the essential elements of the crime beyond a reasonable doubt and clearly supports the verdict on the conspiracy charge.

### B. There is Sufficient Evidence Supporting the Charged Drug Quantity.

The jury returned a special verdict finding Williams responsible for 175 kilograms of PCP. Williams also argues that the drug quantity determination must be reversed, because the evidence tying him to any PCP conspiracy does not connect him to any seized quantity of PCP, let alone 175 kilograms of PCP. We disagree.

To apply the statutory mandatory minimum, the government must prove to the jury beyond a reasonable doubt that Williams's offense involved one kilogram or more of PCP. 21 U.S.C. § 841(b)(1)(A); *United States v. Jordan*, 291 F.3d 1091, 1095 (9th Cir. 2002). Additional quantities used to establish the base offense level under the sentencing guidelines must be proven only by a preponderance of the evidence. *United States v. Kilby*, 443 F.3d 1135, 1140-41 (9th Cir. 2006).

As a preliminary matter, Williams received a life sentence for his involvement in the PCP conspiracy. Although he

argues that the evidence does not connect him to 175 kilograms of PCP, his contention is immaterial to the outcome. Considering Williams's prior felony drug convictions, he was subject to a mandatory minimum sentence of life imprisonment for any amount over one kilogram, per 21 U.S.C. § 841(b)(1)(A). Therefore, the only question of any import to the validity of his sentence is whether there is evidence tying Williams to more than one kilogram of PCP. Because Stinson's testimony indicated that Williams received more than one kilogram of PCP, there is sufficient evidence, beyond a reasonable doubt, to support the sentence imposed. In any event, we find sufficient evidence in the record to support the jury's special verdict.

For purposes of sentencing, a conspirator is to be judged on the quantity of drugs that he reasonably foresaw or which fell within the scope of his particular agreement with the conspirator. *United States v. Garcia-Sanchez*, 189 F.3d 1143, 1147-48 (9th Cir. 1999). The relevant sentencing guideline holds a conspirator accountable for "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(B).

The record reflects Williams's active involvement in the conspiracy: his statements intercepted in conversations with Reed and Stinson's testimony at trial show that Williams understood the nature of the conspiracy and therefore it was reasonably foreseeable that at least 175 kilograms could fall within the scope of the conspiracy or result from the acts of others in its furtherance. For example, two days after 166 kilograms of PCP were seized, Reed spoke with Williams about the seizure and his plans to continue the operation. After that call, Williams spoke with Reed about finding another "spot" to store chemicals and make PCP. Thus, it was

likely foreseeable to Williams that the conspiracy involved large quantities of PCP.

**[25]** Even if there had not been a preponderance of evidence showing a connection to 175 kilograms of PCP, there is sufficient evidence, beyond a reasonable doubt, connecting him to at least one kilogram of PCP, justifying the sentence imposed. Given the mandatory minimum of life imprisonment resulting from a third felony drug conviction, any amount over one kilogram is immaterial. Accordingly, we affirm Williams's sentence.

## VI. THE DISTRICT COURT DID NOT ERR IN DENYING WILLIAMS'S REQUEST FOR A "MERE PRESENCE" INSTRUCTION.

Williams argues that the district court's denial of his request for a jury instruction regarding the "mere presence" defense constitutes reversible error.[18] We review de novo "whether the district court's instructions adequately presented the defendant's theory of the case." *United States v. Howell,* 231 F.3d 615, 629 (9th Cir. 2000) (citation omitted).

A district court may properly refuse to give a "mere presence" instruction when the government's case rests on "more than just a defendant's presence, and the jury is properly instructed on all elements of the crime . . . ." *Id.* at 629 (quoting *United States v. Negrete-Gonzales*, 966 F.2d 1277, 1282 (9th Cir. 1992). *See also* 9th Cir. Crim. Jury Instr. 6.9 comment (2003).

---

[18]The requested instruction provides: "It is not enough that the defendant merely associated with the person committing the crime, or unknowingly or unintentionally did things that were helpful to that person, or was present at the scene of the crime. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the crime charged." *See also* 9th Cir. Crim. Jury Instr. § 5.01.

**[26]** Williams argues that there was testimony by a co-defendant that Williams was merely "hanging out" at Reed's residence and wasn't doing anything. However, the Government presented ample evidence that Williams was more than "merely present" or merely had knowledge of the PCP conspiracy. As discussed above, Stinson testified that Williams was actively involved in distributing large quantities of PCP that Reed had manufactured. Wiretap recordings also showed that Williams spoke with Reed about plans to continue PCP manufacturing after a lab seizure, and Williams advised Reed on how to avoid law enforcement. The record confirms that Williams was not "merely present" by innocent association, nor merely a consumer of PCP. The record shows that Williams actively advanced the PCP conspiracy. Therefore, we conclude that a "mere presence" jury instruction was unnecessary, because the Government's case rested on more than just Williams's presence alone, and the jury was properly instructed on all of the elements of the crimes. *See Howell*, 231 F.3d at 629. Moreover, the "mere presence" instruction was adequately covered by the instructions given on conspiracy.[19] *See United States v. Govan*, 152 F.3d 1088, 1093 (9th Cir. 1998). Therefore, the district court did not err in refusing to give a "mere presence" instruction.

## VII. THE DISTRICT COURT DID NOT ERR IN NOT GIVING A SEPARATE INSTRUCTION ON AID-ING AND ABETTING FOR COUNT I.

We reject Williams's challenges to the conspiracy instruction and the special verdict form regarding drug quantity. Williams made no objection to these instructions at trial.

---

[19]The jury was instructed that "one who has knowledge of a conspiracy but happens to act in a way which furthers some object or purpose of the conspiracy doesn't thereby become a conspirator" and that "a person doesn't become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists."

Therefore, we review these instructions for plain error. *United States v. Sanders*, 421 F.3d 1044, 1050 (9th Cir. 2005) (citation omitted). To show plain error, Williams must prove that there is: "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." *Id.* Even if all three conditions are met, we must still exercise discretion and may only reverse for plain error if "the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citation omitted).

"In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States* v. *Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000) (citation omitted). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* (citation omitted).

## A.   The Failure to Give an Aiding and Abetting Instruction Was Not Plain Error.

Williams argues that the district court erred in refusing to instruct the jury on the meaning of "aiding and abetting" as to the conspiracy charge, and that this lowered the *mens rea* requirement, because it did not give any "knowingly or intentionally" instruction. We disagree.

The jury instructions, read as a whole, were not misleading or inadequate. *See id.* at 1230. The jury was instructed (using Ninth Circuit Model Instructions 8.16 and 8.20) regarding the elements of the crime for which Williams was charged: conspiracy. Thus, the jury was instructed that it had to find that Williams "became a member of the conspiracy *knowing* of at least one of its objects and *intending* to help accomplish it." (emphasis added). The jury was also instructed that one "becomes a member of a conspiracy by *willfully* participating in the unlawful plan with the *intent* to advance or further some object or purpose of the conspiracy . . ." (emphasis added).

The jury was also instructed that "one who has knowledge of a conspiracy but happens to act in a way which furthers some object or purpose of the conspiracy doesn't thereby become a conspirator" and that "a person doesn't become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." Further, the jury was actually instructed as to the elements of aiding and abetting in connection with instructions on other counts.

**[27]** Given the record, we conclude that jury instructions, when read as a whole, did not lower the *mens rea*, and were not misleading or inadequate to guide the jury's deliberations. Even if the district court should have issued an additional instruction specifically defining "aiding and abetting" in a conspiracy, the district court did not commit plain error.

## B.   The Special Verdict Form Was Not Plain Error.

Williams also asserts error in establishing his base offense level under the Guidelines, because he claims that the special verdict form relating to the charged drug quantity lowered the burden of proof. Because Williams did not object to the special verdict form at trial, we review only for plain error. *See Sanders*, 421 F.3d at 1050 (citation omitted). Williams argues that the instruction allowed the jury to find the charged drug quantity (required under the guidelines to justify a life sentence) if the 175 kilograms of PCP was "*either* within the scope of [Williams's] agreement with his co-conspirators *or* the 175 kilograms was reasonably foreseeable to appellant." (emphasis in original). Citing the sentencing guidelines, Williams argues that the relevant conduct for sentencing must be both within the scope of the agreement *and* reasonably foreseeable. *See* U.S.S.G. 1B1.3, Application Note 2.

> In the case of a jointly undertaken criminal activity . . . a defendant is accountable for the conduct (acts and omissions) of others that was both:

(i) in furtherance of the jointly undertaken criminal activity; and

(ii) reasonably foreseeable in connection with that criminal activity.

U.S.S.G. 1B1.3, Application Note 2. Williams contends that the district court's use of the disjunctive lowered the burden of proof.

[18] We conclude that the special verdict form is consistent with our prior statements of the law relating to sentencing under the statutory mandatory minimum. *See United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003). In *Banuelos*, we stated, "In sentencing a defendant convicted of conspiracy to distribute a controlled substance . . . the court must find the quantity of drugs that either (1) fell within the scope of the defendant's agreement with his coconspirators *or* (2) was reasonably foreseeable to the defendant." 322 F.3d at 704 (emphasis added and internal citations omitted). *See also United States v. Gutierrez-Hernandez*, 94 F.3d 582, 585 (9th Cir. 1996) ("[U]nder the Sentencing Guidelines, each conspirator is to be judged on the basis of the quantity of drugs which he reasonably foresaw *or* which fell within 'the scope' of his particular agreement with the conspirators, rather than on the distribution made by the entire conspiracy.") (emphasis added); *United States v. Petty*, 982 F.2d 1374, 1376 (9th Cir. 1993) (same). Therefore, the district court did not commit plain error in using the disjunctive in the special verdict form.

Even if the district court's use of the disjunctive were error, Williams cannot show prejudice, because any error does not affect his sentence. As Application Note 2 of the relevant sentencing guideline provides, the "requirement of reasonable foreseeability applies only in respect to the conduct (i.e., acts and omissions) of others [and] does not apply to conduct that the defendant personally undertakes . . ." U.S.S.G. 1B1.3, Application Note 2(ii). Here, as previously discussed, there is

sufficient evidence for a jury to find, beyond a reasonable doubt, that Williams personally received at least one gallon of PCP for distribution as part of the conspiracy. Under 18 U.S.C. § 841(b)(1)(A), where Williams had two prior felony drug convictions, he was subject to a mandatory minimum sentence of life in prison regardless of the calculation of his base level offense under the Guidelines. Therefore, where Williams's personal conduct is proven, the requirement of reasonable foreseeability as to the acts or omissions of others does not apply. Accordingly, we affirm the district court's special verdict form regarding the charged drug quantity, because it was not plain error to use the disjunctive in the special verdict form, and, in any event, Williams cannot show prejudice.

## VIII.  RULE 11 DOES NOT APPLY TO A DEFENDANT'S ADMISSION TO PRIOR FELONIES CHARGED IN AN INFORMATION UNDER 21 U.S.C. § 851(B).

Williams finally argues (for the first time on appeal) that the district court erred by not conducting a Rule 11 colloquy prior to Williams's admission to two prior felony drug convictions under 21 U.S.C. § 851(b). We review for plain error a challenge to the district court's colloquy under § 851(b), not raised in the district court. *See United States v. Thomas*, 348 F.3d 78, 86 (5th Cir. 2003). We conclude that the district court committed no plain error in its § 851(b) colloquy.

Williams relies on California law for the proposition that an admission of a prior conviction that enhances a sentence is the functional equivalent of a guilty plea. *See Wright v. Craven*, 461 F.2d 1109 (9th Cir. 1972) (interpreting California's habitual criminality statute, Cal. Penal Code § 644(b) (repealed July 1, 1977)). Construing California's prior law on habitual offenders, we held that an admission to prior convictions, which enhanced the sentence, could not be accepted unless the defendant understood the consequences of the admission.

*Id.* at 1109 (citing *Womack v. Craven*, 431 F.2d 1191, 1192 (9th Cir. 1970)). Thus, Williams contends that, because admission of his two prior felonies resulted in a life sentence, he was entitled to a full Rule 11 colloquy. We disagree. First, we are not bound by California's now-repealed law on habitual offenders. Second, Rule 11, which applies only to guilty pleas, *see* Fed. R. Crim. P. 11, does not govern this case. Instead, we hold that § 851(b) governs the colloquy a district court must have with a defendant before he admits to prior felony convictions.

Section 851(b) requires the court to (1) ask the defendant whether he admits or denies his prior convictions and (2) instruct the defendant that should he wish to challenge his convictions, he must do so in writing, before sentencing or be prohibited from raising them at any later date. *See* 21 U.S.C. § 851(b); *United States v. Severino*, 316 F.3d 939, 943 (9th Cir. 2003) (en banc)).

In this case, Williams was informed of his right to have the Government prove the prior convictions to the court beyond a reasonable doubt. He was likewise advised of the factual bases for the prior convictions and affirmatively concurred with the factual bases. Williams indicated that he made the admissions freely and voluntarily and without coercion. His admission was also intelligent where he made the admission only after consulting with counsel.

**[29]** Although not raised by Williams, we note that record does not disclose that the district court advised Williams that he must bring any challenges to the prior convictions in writing before sentence is imposed. This omission, while error, is harmless, because Williams does not challenge the legality of the prior convictions and argues only that he had "nothing to lose" and that "it is reasonably probable that he would have contested the priors had he been properly advised." We adopt the reasoning of the Fifth Circuit, which held, "a district court's failure to give a § 851(b) colloquy does not affect the

defendant's substantial rights where the 'defendant failed to . . . challenge the convictions [alleged in the filed information] and never revealed what challenges he was prepared to level.' " *Thomas*, 348 F.3d at 87 (citations omitted) (affirming a sentence with a § 851 enhancement where no colloquy was given).

In this case, it was not plain error for the district court to give Williams a § 851(b) colloquy, because a full Rule 11 colloquy was not required. To the extent that the district court's 851(b) colloquy was deficient, Williams cannot demonstrate prejudice where he does not challenge the validity of the underlying convictions.

## CONCLUSION

For the reasons set forth above, we affirm the convictions and sentences of Reed, Williams, and Johnson on all counts.

**AFFIRMED.**